**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Helen Nyerges, et al.,

          Plaintiffs,

v.

Hillstone Restaurant Group Incorporated,

          Defendant.

No. CV-19-02376-PHX-DWL

**ORDER**

This is a dram-shop liability action arising out of the death of Lewis Nyerges ("Nyerges"). On the evening in question, Nyerges and a group of companions consumed food and drinks at Bandera, a Scottsdale restaurant operated by Hillstone Restaurant Group Incorporated ("Hillstone"). Around 10:00 p.m., Nyerges choked while eating his meal, collapsed, and was rushed to the hospital, where he later died. Although Nyerges's formal cause of death was asphyxiation due to choking on a piece of meat, his blood alcohol concentration ("BAC") was measured at .422 at the hospital.

Now pending before the Court are (1) a motion for Rule 37 sanctions filed by Helen Nyerges, Nyerges's wrongful death statutory beneficiary, and Warren Nyerges, Nyerges's estate's representative (collectively, "Plaintiffs") (Doc. 89); and (2) Hillstone's motion for summary judgment (Doc. 96).[1] For the following reasons, each motion is granted in part and denied in part.

---

[1]     Hillstone's motions to exclude the expert testimony of M. Randy Durnal, Chester Flaxmayer, and Larry D. Stokes and Michael J. Stokes (Docs. 92-94) are addressed in an accompanying order.

**BACKGROUND**

I.   <u>Factual Background</u>

The following facts, which are relevant to both motions, are derived from the documents attached to the parties' summary judgment briefing.  These facts are undisputed unless otherwise noted.

On January 20, 2018, Nyerges joined four friends at Bandera for dinner and drinks. (Doc. 96-1 at 10-12.)  One of the friends, Michael Christley ("Christley"), had known Nyerges for over 20 years.  (*Id.* at 6.)  Nyerges lived in Ohio, but it was customary for him to visit Arizona in January for work, and Nyerges and Christley would often meet up during these visits.  (*Id.* at 11.)  Christley describes Nyerges as "a really funny guy" who "kind of commands the room" and "a very frequent . . . heavy drinker." (*Id.* at 8, 13, 18.)  Christley testified that Nyerges's social and alcohol habits were related to his work in sales, because Nyerges "had to entertain customers and clients all the time," often going to "dinners," "golfing events," and "sporting events."  (*Id.* at 7.)  Christley recalls that Nyerges "was one of those guys that started drinking at noon" and that when Nyerges visited Arizona, he would typically start drinking earlier in the day, such that by the time Christley and Nyerges would meet in the evening, Nyerges ordinarily "was already fairly well into the drinking exercise."  (*Id.* at 8.)  Christley also perceived Nyerges as having "a high tolerance for alcohol."  (*Id.* at 9.)

On the night in question, Nyerges was scheduled to meet with Christley; Christley's wife, Stephanie Christley, who was acquainted with Nyerges; and another couple, Jay and Michelle Littlefield (collectively, the "Littlefields"), who had not met Nyerges before.  (*Id.* at 11-12, 55; Doc. 112-1 at 28, 33.)

The Christleys and the Littlefields booked a 7:30 p.m. reservation at Bandera.  (Doc. 96-1 at 11.)  Before going to Bandera, the four friends met at the Christley house and drank approximately one cocktail each, although Stephanie Christley likely did not partake at that time or had perhaps "a couple sips."  (Doc. 112-1 at 17-18, 32, 50.)  Next, they went to Bandera before their reservation to enjoy drinks at the bar.  (Doc. 96-1 at 30-31, 74.)

Nyerges arrived approximately 30-45 minutes late, and in the meantime the four friends waited at the bar where they each had one to three drinks.  (*Id.* at 31, 74,; Doc. 112-1 at 18, 32-33, 51.)  The Christleys and the Littlefields don't know why Nyerges was late or how he had spent his time earlier in the day.  (Doc. 112-1 at 6-7.)  The restaurant was busy and noisy that Saturday night.  (Doc. 96-1 at 13, 16, 49, 60.)

Nyerges arrived at approximately 8:00 or 8:15, making what Christley calls a "grand entrance."  (*Id.* at 13.)  Based on his experiences with Nyerges, Christley expected that Nyerges had been drinking before he arrived at the restaurant.  (*Id.* at 14-15.)  Raina Banuelos ("Banuelos"), a bartender at Bandera who worked that evening, recalled Nyerges being "very loud and boisterous" when he entered.  (Doc. 112-1 at 54-55.)  Stephanie Christley, on the other hand, did not recall anything out of the ordinary about Nyerges's arrival.  (*Id.* at 34.)  At any rate, Christley proceeded to introduce Nyerges to the Littlefields.  (Doc. 96-1 at 45.)  The Littlefields described their first impressions of Nyerges as "an outgoing personality," "very friendly, "talkative right out the bat," and "genuine."  (*Id.* at 45-46, 58.)

Nyerges then ordered five shots of tequila for the group and a vodka soda for himself.  (*Id.* at 31, 48; Doc. 112-1 at 51.)  As discussed in more detail below in relation to the pending motions, the question of who took Nyerges's drink order, made the drinks, and/or served the drinks is disputed (and the subject of alleged discovery violations).

After approximately 15-20 additional minutes at the bar—around 8:30 or 8:45—the group was seated in the dining area.  (Doc. 96-1 at 24, 31, 59.)  Before going to the table, Nyerges stayed at the bar to pay his drink tab.  (Doc. 112-1 at 12-13.)  He had some difficulty tallying the bill and tip.  (*Id.* at 13.)  Christley stayed behind to help him.  (*Id.*)  Bandera's records show that a bill had to be printed at least four times before Nyerges left the correct amount.  (Doc. 112-2 at 11; Doc. 112-3 at 3, 6, 9, 11.)  Christley provided two explanations for Nyerges's difficulty, recalling that "it's fairly dark" in Bandera (Doc. 112-1 at 13) and that Nyerges may not have been able to "comprehend the total" because "he was inebriated."  (*Id.* at 19.)  Christley testified that Nyerges had experienced bill-totaling

issues in the past, usually when intoxicated.  (*Id.* at 22.)

The group brought their drinks from the bar to the dining area.  (Doc. 96-1 at 66.) Bandera manager Kayla Gard ("Gard") showed the party to their table.  (*Id.* at 65.)  Megan Waldo ("Waldo") was the server assigned to the party's table.  (Doc. 96-2 at 7, 12.)

As discussed in more detail below in relation to the two pending motions, Bandera staff and the four friends give conflicting accounts both as to what Nyerges and the party ordered at the dinner table and whether Nyerges appeared to be "obviously intoxicated."

Waldo testified that the party "did not order drinks; I did not serve them" and that she doesn't "believe" they ordered any drinks at the table from any other Bandera personnel.  (*Id.* at 12-14.)

Gard, by contrast, testified that at some point in the evening, the party ordered a bottle of wine from her and she told Waldo about the order, because it would have been Waldo's responsibility to serve the wine.  (Doc. 112-1 at 61.)  She believes this bottle of wine never made it to the table.  (*Id.* at 61.)

An audit report copy of the party's bill states that an order for five cocktails was placed with Waldo at 8:56 p.m.  (Doc. 112-3 at 4.)  There is limited witness testimony regarding these drinks,[2] but they appear to be distinct from the drinks ordered earlier at the bar that the group brought with them to the table.  (*Compare* Doc. 112-3 at 4 [records of drinks ordered with "MEGAN W."] *with* Doc. 112-3 at 3, 6 [records of drinks ordered with "RAINA B."].)  These same five drinks appear in a check receipt that apparently was printed later in the evening.  (Doc. 112-3 at 7.)

Christley observed Nyerges drink only the vodka soda and tequila shot he ordered upon arrival.  (Doc. 112-1 at 10-11.)  Christley recalled, however, that each of the other four members of the group ordered a glass of wine shortly after being seated, and especially that he ordered one glass of wine for himself.  (*Id.* at 14, 21.)  Christley also recalled that

---

[2]     The only witness to testify that anybody ordered cocktails (rather than wine) while seated in the dining area is Jay Littlefield, who recalled that at least he and Christley ordered drinks, specifically a martini for Christley and a "black martini" for himself.  (Doc. 112-1 at 44.)  This recollection is not fully consistent with the check referenced above, although one of the five drinks listed on the check is a martini.  (Doc. 112-3 at 4.)

Nyerges repeatedly asked for a wine list, which was never brought to the table.  (*Id.* at 14-15.)  Christley's "impression" was that the servers did not bring Nyerges the wine list because they decided Nyerges should not be served any more alcohol.  (*Id.* at 15-16.)

Stephanie Christley similarly testified that Nyerges asked for a wine list but she had the impression that the waitress did not want to bring it, because the waitress "picked up on something.  She wouldn't give him a wine – any wine."  (*Id.* at 29.)  Stephanie Christley further recalls that everybody other than Nyerges "got drinks" at the table.  (*Id.* at 37.)

Jay Littlefield recalls that he and Christley ordered another round of drinks at the table but is not sure about the two women or Nyerges.  (*Id.* at 44.)  He also remembers Nyerges asking for a wine list.  (*Id.*)  He does not remember anybody stating that Nyerges would not or could not be served any more alcohol.  (*Id.* at 45.)

In any event, the record demonstrates that the group ordered food at around 9:20 p.m., one entrée for each person.  (Doc. 96-2 at 7.)  Nyerges ordered prime rib.  (Doc. 96-1 at 19.)  The food arrived at around 9:40 p.m.  (Doc. 112-1 at 29.)  Christley recalls that he, Nyerges, and Jay Littlefield were conversing and laughing around this time.  (Doc. 96-1 at 18.)  Jay Littlefield, too, remembers sitting beside Nyerges and that Nyerges was "very talkative."  (*Id.* at 44.)  Michelle Littlefield recalls that Nyerges was carrying on a normal conversation at the dinner table.  (*Id.* at 56.)  Stephanie Christley recalls Nyerges eating quickly and taking "[u]nusual big bites" of meat while talking with the four friends.  (*Id.* at 37; Doc. 112-1 at 30.)

At approximately 9:50, Nyerges wordlessly arose from the table and walked toward the restroom.  (Doc. 96-1 at 19-20, 56; Doc. 112-1 at 23, 29, 41, 49.)  None of the four friends noticed anything amiss as Nyerges left the table, other than his not saying anything as he did so.  (Doc. 96-1 at 20-22.)

Several Bandera personnel were gathered in the "expo" area between the table and the restroom.  Among them was Bandera manager Christina Goodman ("Goodman"), who recalls Nyerges approaching, tapping her, and gesturing toward the bathroom.  (Doc. 96-2 at 31-32; Doc. 112-2 at 10.)  Before Goodman could respond, Bandera server Aliah Brown

("Brown") intervened and showed Nyerges to the restroom.  (Doc. 96-2 at 32, 40-41.)  Although Nyerges did not speak to Brown except through gestures, Brown did not notice anything out of the ordinary in Nyerges's stride or manner.  (*Id.* at 40-42.)  As he walked to the bathroom with Brown, Nyerges hit the corner of a wall and stumbled slightly.  (Doc. 112-2 at 14.)  Then, just as he reached the threshold of the men's restroom, Nyerges collapsed to the floor. (Doc. 96-2 at 43.)  Brown then approached Bandera general manager Kelly Rodavich ("Rodavich") to tell her what had happened.  (*Id.* at 48; Doc. 112-2 at 19.)  After Rodavich confirmed that Nyerges was passed out in the bathroom entrance, she called 911.  (Doc. 96-2 at 48.)  Before the paramedics arrived, Bandera server Megan Skousen ("Skousen") felt for Nyerges's pulse and started doing chest compressions.  (*Id.* at 54.)  She continued performing chest compressions until the fire department arrived.  (*Id.* at 54-55.)

In the meantime, a Bandera manager told the four friends that something was wrong with Nyerges.  (Doc. 112-1 at 29.)  The friends then went to his side.  (*Id.* at 29-30.)  Emergency personnel arrived about ten minutes after Nyerges collapsed.  (*Id.* at 30.)  Nyerges was subsequently taken to the hospital.  (Doc. 96-2 at 59.)  A medical report from the hospital states that a large piece of meat was found in Nyerges's throat and removed, and the diagnosis of his condition was "[c]hoking due to food in larynx." (*Id.*)  Bloodwork from the hospital visit also revealed that Nyerges had an ethyl alcohol percentage of 0.422%.  (*Id.* at 63.)  The medical examiner's report states Nyerges's ethanol level was "markedly elevated." (Doc. 112-3 at 25.)  Medical staff were able to restore Nyerges's heartbeat and breathing after the meat was removed, but Nyerges never regained consciousness.  (*Id.*)  He was placed on palliative care and died several days later.  (Doc. 96-2 at 61, 67; Doc. 112-3 at 25.)  Nyerges's death certificate lists his cause of death as accidental asphyxiation due to suffocation.  (Doc. 96-2 at 61; Doc. 112-3 at 24-25.)

II.   Procedural History

On August 23, 2018, Plaintiffs filed this lawsuit in Maricopa County Superior Court. (Doc. 1 at 9-14.)  Initially, the complaint only named fictitious defendants.  (*Id.*)

On January 22, 2019, Plaintiffs filed the operative version of the complaint in Maricopa County Superior Court, this time naming Hillstone as a defendant.  (*Id.* at 21-27.)

On March 14, 2019, Plaintiffs served Hillstone.  (*Id.* at 37.)

On April 12, 2019, Hillstone removed the action to this Court.  (*Id.* at 1-2.)

The parties then conducted discovery.  (*See, e.g.*, Docs. 17-36.)  This led to a variety of disputes (Docs. 37, 67, 68, 80, 88), which the Court resolved in a series of orders (Docs. 39, 71, 75, 84, 103).  Plaintiffs also filed, then withdrew, a motion for sanctions.  (Docs. 78, 83.)

On September 14, 2020, Plaintiffs filed a second motion for sanctions (Doc. 89), which is now fully briefed (Docs. 98, 107).

On September 25, 2020, Hillstone filed a motion for summary judgment (Doc. 96), which is also now fully briefed (Docs. 112, 115).

On July 20, 2021, the Court issued a tentative ruling addressing the sanctions and summary judgment motions.  (Doc. 117.)

On July 27, 2021, the Court heard oral argument.  (Doc. 119.)

## DISCUSSION

I.    Motion For Sanctions

Plaintiffs move for sanctions under Federal Rule of Civil Procedure 37.  (Doc. 89.) They assert that Hillstone (1) failed to preserve relevant video evidence from the night in question and (2) provided incomplete or misleading information in its Mandatory Initial Discovery Pilot Program ("MIDP") disclosures regarding which Bandera personnel actually served alcohol to Nyerges and his party.  (*Id.* at 8-10.)[3]  To remedy these alleged

---

[3]    Although page one of Plaintiffs' motion lists three distinct assertions of wrongdoing (Doc. 89 at 1 ["Defendants 1) have failed to preserve evidence; 2) provided misleading MIDP responses; and 3) failed to provide unfavorable information in their MIDP responses"]), the motion later discusses Hillstone's alleged wrongdoing as falling under two categories: "Relevant video evidence was not preserved" and "Defendant's MIDP Responses were misleading and omitted unfavorable information" (Doc. 89 at 1, 8-10). The reply likewise groups Plaintiffs' argument under two headings: "Who served Lewis Nyerges alcohol?" and "Where is the video?"  (Doc. 107 at 6-10.)  Accordingly, although Hillstone's response follows a tripartite form, the Court focuses its analysis on Hillstone's alleged failure to disclose two witnesses in its MIDP responses and its failure to preserve

offenses, Plaintiffs ask the Court to strike Hillstone's answer and enter default judgment in their favor or, in the alternative, to order that certain facts "be taken as established for purposes of the action."  (*Id.* at 1.)

Because the grant or denial of Plaintiffs' proposed sanctions could significantly affect the disposition of Hillstone's summary judgment motion, the Court addresses the sanctions motion first.

### A.   **Video Footage**

#### 1.   Legal Standard

Because the video footage qualifies as electronically stored information ("ESI"),[4] Plaintiffs' request for sanctions related to the video footage is governed by Rule 37(e) of the Federal Rules of Civil Procedure.  Rule 37(e) was "completely rewritten" in 2015 to "provide[] a nationally uniform standard for when courts can give an adverse inference instruction, or impose equally or more severe sanctions, to remedy the loss of ESI."  1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 37, at 1194 (2021).  The text of Rule 37(e) now provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1)   upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2)   only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

---

certain video footage, because those are the two substantive bases for sanctions asserted in Plaintiffs' motion.

[4]    The parties did not brief this issue under Rule 37(e), but the Court concludes the footage is ESI because it was presented to the Court in digital form.  *Cf. DR Distribs., LLC v. 21 Century Smoking, Inc.*, — F. Supp. 3d —, 2021 WL 185082, *15 n.19 (N.D. Ill. 2021) ("The digitized video was attached as a .mov file to an email.  It was ESI."); *Bistrian v. Levi*, 448 F. Supp. 3d 454, 467 (E.D. Pa. 2020) ("While there is no definitive evidence as to whether the FDC's surveillance footage was digital or analog in 2006, it appears almost certain that it was digital, so Rule 37(e) applies.").  In any event, were the Court instead to weigh the propriety of sanctions under its inherent power or other subsections of Rule 37, it would reach the same result.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                 (A)       presume that the lost information was unfavorable to the party;

                 (B)       instruct the jury that it may or must presume the information was unfavorable to the party; or

        (C)       dismiss the action or enter a default judgment.

*Id.*  A court cannot rely on its inherent authority or state law when deciding whether sanctions based on the loss of ESI are appropriate—the standards supplied by Rule 37(e) are exclusive.  Gensler, *supra*, at 1198.  *See also Newberry v. County of San Bernardino*, 750 Fed. App'x 534, 537 (9th Cir. 2018) ("The parties framed the sanctions issue as invoking the district court's inherent authority.  However, at the time the sanctions motion was filed, sanctions were governed by the current version of Rule 37(e) . . . [which] therefore foreclose[d] reliance on inherent authority to determine whether terminating sanctions were appropriate.") (citations and internal quotation marks omitted).

     A party seeking sanctions under Rule 37(e) has a threshold duty to show that the ESI at issue was, in fact, lost or destroyed.  Fed. R. Civ. P. 37, advisory committee note to 2015 amendment ("The new rule applies only . . . when [ESI] is lost.").  If such a showing has been made, the court must then determine whether "(1) [the non-movant] failed to preserve that ESI 'that should have been preserved' in anticipation or conduct of litigation; (2) the information was lost because [the non-movant] failed to take reasonable steps to preserve it; (3) the ESI cannot be restored or replaced through additional discovery; and (4) the [movant] was prejudiced by the loss."  *FTC v. DirecTV, Inc.*, 2016 WL 7386133, *3 (N.D. Cal. 2016).  *See also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("The new rule applies only if the lost information should have been preserved in the anticipation or conduct of litigation and the party failed to take reasonable steps to preserve it.").  Additionally, although the Court's sanctioning power under Rule 37(e)(1) is conditioned upon a showing of prejudice to the movant, Rule 37(e)(2) authorizes the imposition of sanctions irrespective of prejudice if the non-movant "acted with the intent to deprive" the movant "of the information's use in the litigation."

    …

1

2.   <u>Analysis</u>

2       Hillstone preserved two videos from the night in question: (1) footage of the expo

3   area, which depicts when Nyerges approached and tapped Goodman and was led to the

4   restroom by Brown and when Brown rushed back to the expo area to alert Rodavich of

5   Nyerges's collapse; and (2) footage of the hallway outside the restroom, which depicts

6   Nyerges's stumbling and collapse, Bandera staff's responses, and the arrival and departure

7   of emergency personnel. (Doc. 114.) On June 17, 2020, as part of the discovery process,

8   Plaintiffs asked Hillstone to produce "any and all photo, audio, and/or video recordings

9   taken in or around [Bandera] from 6:00 P.M. on January 20, 2018, to 11:59 P.M. on January

10  20, 2018." (Doc. 89-15 at 1.) Hillstone objected to this request as "irrelevant, vague,

11  ambiguous, and overly broad" and stated that its previously produced footage of the

12  restroom hallway and expo area constituted "[a]ll video recordings of the subject incident."

13  (*Id.* at 1-2.)

14      Plaintiffs now contend that Hillstone should have preserved additional video

15  footage depicting the area of the bar's cash register. (Doc. 89 at 8-9.) "Plaintiffs do not

16  dispute that the video evidence from the bar area would not depict Lewis Nyerges," but

17  claim this evidence would have shown who in fact sold and served alcohol to Nyerges and

18  who had to reopen Nyerges's tab when he had trouble computing the total. (*Id.* at 9.) These

19  facts, Plaintiffs maintain, are otherwise unknown to them, at least in part because this video

20  evidence was not preserved. (*Id.*) To cure the alleged prejudice of not having footage

21  depicting the bar's cash register area, Plaintiffs ask the court to "establish as fact that Raina

22  Banuelos served, sold, and furnished Lewis Nyerges with alcoholic beverages" and that

23  "Kelly Rodavich had to reopen Lewis Nyerges's tab." (*Id.* at 9.) Such findings, Plaintiffs

24  argue, are supported by other evidence in the record. (*Id.*)[5]

25

26  ---

[5]      The Court notes that Plaintiffs' proposed findings contradict to some extent the
27  deposition testimony of Banuelos and Rodavich. Banuelos testified that she made drinks
    for the four friends before Nyerges arrived but did not remember making or serving the
28  drinks that Nyerges later ordered at the bar. (Doc. 107-1 at 2, 4-5.) Rodavich testified that
    she "had no awareness, no knowledge, no contact" with Nyerges or his party before
    Nyerges's collapse. (Doc. 112-2 at 17.)

1   Hillstone responds that it acted in good faith regarding the video footage from the

2 bar area, because it "reasonably believed the incident to be a choking event and acted

3 accordingly" in the immediate aftermath of the incident by "clipp[ing] its surveillance

4 video from inside the restaurant" showing Nyerges choking.  (Doc. 98 at 12.)  Hillstone

5 contends it was unaware at that time that Nyerges's death may have been linked to alcohol

6 consumption at Bandera and emphasizes that, "in the nearly fourteen[] months between the

7 choking incident" and service of Plaintiffs' complaint, Hillstone never received "a

8 preservation letter explaining any potential dram-shop claim or asking to preserve specific

9 evidence."  (*Id.* at 13.)  Thus, Hillstone argues, it was unaware that Plaintiffs would file a

10 dram-shop claim and only preserved video evidence from the dining area that showed the

11 choking incident itself.  (*Id.*)  Hillstone also argues that the video evidence would not be

12 probative of Plaintiffs' claims because, as Plaintiffs themselves admit, the footage would

13 not depict Nyerges, and because the other facts the video might support are themselves not

14 probative.  (*Id.* at 13-14.)  Relatedly, Hillstone contends that its failure to preserve was

15 harmless, because even if the video footage could show that the bartenders had to print

16 Nyerges's ticket multiple times, this showing would not create an issue of fact as to whether

17 Nyerges was obviously intoxicated at Bandera.  (*Id.* at 14-15.)

18   Plaintiffs reply that Hillstone was "clearly on notice to preserve evidence" of the

19 night in question, as indicated by its preservation of video footage from the expo area and

20 bathroom hallway, and that it is "self-serving" for Hillstone to assert, without evidence or

21 affidavit, that it did not preserve the bar footage because it only understood Nyerges's death

22 to be a choking incident.  (Doc. 107 at 10.)  Plaintiffs also argue that the bar footage is not

23 merely collateral to their case, "as the video would show who served Lewis Nyerges

24 alcoholic beverages – something no one has, as of yet, admitted to doing."  (*Id.*)

25   Hillstone has the better of these arguments.  The threshold inquiry—whether ESI

26 was in fact lost—goes in Plaintiffs' favor because Hillstone does not dispute that footage

27 was lost or destroyed.  For example, Hillstone's counsel acknowledged in an August 17,

28 2020 letter that there was a "camera angled over the bar" and that "given the time frame

that has elapsed since the loss to Plaintiff's request, it was unlikely . . . [that] footage would be obtainable at this point in time." (Doc. 89-17.) Further, Hillstone explains in response to the sanctions motion that it did not preserve footage from the bar area because "Hillstone (reasonably) believed it was dealing with a choking incident occurring in the dining room, not the bar—and that is exactly the video footage that Hillstone clipped and preserved." (Doc. 98 at 12-13.)

Although this threshold inquiry is met, the other factors tip in Hillstone's favor. First, Plaintiffs have not established that the bar footage "should have been preserved in the anticipation or conduct of litigation." *See* Fed. R. Civ. P. 37(e). A "duty to preserve evidence which [a party] knows or reasonably should know is relevant" arises "[a]s soon as a potential claim is identified." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 549 (N.D. Cal. 2018) (internal quotation marks omitted). However, "[a] general concern over litigation does not trigger a duty to preserve evidence," and the duty to preserve does not arise "until a potential claim [is] identified or future litigation [is] probable." *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 526 (N.D. Cal. 2009). Plaintiffs did not serve their complaint on Hillstone until March 2019, nearly fourteen months after the incident, and there is no evidence that Plaintiffs otherwise notified Hillstone of a potential dram-shop lawsuit or requested the preservation of evidence before the video was destroyed. Sanctions are not appropriate under such circumstances. *Cf. United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009) ("A party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of business."); *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (not spoliation to destroy evidence in ordinary course before notice of lawsuit); *Nguyen v. Costco Wholesale Corp.*, 2020 WL 413898, *2-3 (S.D. Fla. 2020) (defendant did not have a duty to preserve footage of slip-and-fall when lawsuit was filed nearly two years after date of accident).

In a related vein, even if it could be said that Hillstone had a duty to preserve *some*

evidence from the night in question, Plaintiffs have not established that Hillstone should have preserved the specific piece of ESI at issue here—the bar footage. *See* Fed. R. Civ. P. 37(e), advisory committee note to 2015 amendment ("Courts should consider the extent to which a party was on notice that litigation was likely *and that the information would be relevant*. . . . [T]he scope of information that should be preserved may remain uncertain. It is important not to be blinded to this reality by hindsight arising from familiarity with an action as it is actually filed.") (emphasis added).   In the wake of Nyerges's choking incident, Hillstone preserved footage that depicted Nyerges in the lead-up to and aftermath of his choking.   It is unclear how footage that admittedly does not depict Nyerges at all would be relevant to this action from Hillstone's vantage point, much less how this evidence could have been perceived as potentially relevant before Hillstone was served with the complaint, which occurred over a year after the incident itself.

Plaintiffs' arguments to the contrary are unpersuasive.   For example, Plaintiffs note that the footage might have shown the other bartenders working with Banuelos that night. But as discussed in the preceding paragraphs, Hillstone had no reason to suspect, until it was served with Plaintiffs' complaint, that the identity of bartenders might be a relevant issue in future dram-shop litigation—until that point, Nyerges's collapse appeared to be the result of a choking incident.   Plaintiffs also contend the footage might show Bandera staff reprinting Nyerges's receipt several times.   But again, Hillstone had no reason to suspect, at the time of the challenged preservation and destruction decisions, that bill-reprinting footage might have any relevance in future litigation.   Moreover, the missing footage is unnecessary to prove the fact of bill reprinting, which is established through other evidence (Doc. 112-2 at 11; Doc. 112-3 at 3, 6, 9, 11) in the record.   And as noted, sanctions are available under Rule 37(e)(1) only when the missing ESI "cannot be . . . replaced through additional discovery."   *DirecTV, Inc.*, 2016 WL 7386133 at *3.

Accordingly, the Court declines to impose sanctions against Hillstone for failing to preserve the bar area video footage.

…

1

2

### B.   **MIDP Violations**

#### 1.   Legal Standard

Because this case was removed in April 2019, it was (and remains) subject to the MIDP, which applies to most civil cases filed between May 1, 2017 and May 1, 2020.  *See* D. Ariz. G.O. 17-08.  Under the MIDP, the parties "are ordered to provide mandatory initial discovery responses before initiating any further discovery in this case.  The responses are called for by the Court, not by discovery requests actually served by an opposing party." *Id.* ¶ A.2.  "Each party's response must be based on the information then reasonably available to it," and a "party is not excused from providing its response because it has not fully investigated the case."  *Id.* ¶ A.3.  Additionally, "[t]he duty to provide mandatory initial discovery responses . . . is a continuing duty, and each party must serve supplemental responses when new or additional information is discovered or revealed."  *Id.* ¶ A.8.  As relevant here, one category of information that is subject to mandatory, initial disclosure under the MIDP is "the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses," as well as "a fair description of the nature of the information each such person is believed to possess."  *Id.* ¶ B.1.

Because the disclosures required by the MIDP "supersede the disclosures required by Rule 26(a)(1) and are framed as court-ordered mandatory initial discovery pursuant to the Court's inherent authority to manage cases," *id.* at 1, a violation of the MIDP's disclosure obligations is sanctionable under Rule 37(b)(2).  *Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1222 (9th Cir. 2018) ("In the context of Rule 37(b) sanctions, we 'read broadly' the term 'order' . . . . [to] 'include any order relating to discovery.'") (citations omitted).  Rule 37(b)(2) provides that if a party "fails to obey an order to provide or permit discovery . . . the court . . . may issue further just orders," including ordering that "designated facts be taken as established for purposes of the action," "striking pleadings in whole or in part," or "rendering a default judgment against the disobedient party."  "The scope of sanctions for failure to comply with a discovery order is committed to the sound

1    discretion of the district court." *Payne v. Exxon Corp.*, 121 F.3d 503, 510 (9th Cir. 1997).

2    "The list of merits sanctions contained in Rule 37(b)(2) is not exhaustive; the court

3    may impose any other sanctions as are just under the circumstances." 1 Gensler, *supra*, at

4    1171-72.  As one court has recently observed, "'[a]s long as the sanction is 'just,' there are

5    virtually no limitations on judicial creativity in fashioning a response or remedy to a

6    violation of a discovery order.'" *DR Distribs.*, 2021 WL 185082 at *74 (citation omitted).

7    Among the sanctions a court may impose under Rule 37(b) is an instruction that the jury

8    has permission, but is not required, to draw an adverse inference against the party found to

9    have violated a discovery order. *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1305-

10   07 (11th Cir. 2020).

11       The party seeking to avoid sanctions bears the burden of proving that its failure to

12   disclose was either substantially justified or harmless. *R & R Sails, Inc. v. Ins. Co. of Pa.*,

13   673 F.3d 1240, 1246 (9th Cir. 2012).

14                    2.    The Parties' Written Arguments

15       Plaintiffs argue that Hillstone omitted information or was otherwise misleading in

16   its MIDP responses.  (Doc. 89 at 9-10.)  Specifically, Plaintiffs assert that Hillstone did not

17   disclose the identities of any persons at Bandera who served, sold, or furnished alcohol to

18   Nyerges.  (*Id.* at 10.)  Although Bandera disclosed witnesses who seemed likely to have

19   served alcohol to Nyerges, all of those persons—Skousen, Waldo, and Banuelos—

20   subsequently testified that they never served (or did not recall serving) Nyerges or his party.

21   (*Id.*)  Additionally, in one deposition, taken six days before the close of discovery,

22   Banuelos stated that two Hillstone employees named Dezman Solomon ("Solomon") and

23   Alyssa Bralich ("Bralich"), who had never been identified in any of Hillstone's MIDP

24   responses or in any other context, in fact made drinks for Nyerges and his party when they

25   were at the bar.  (*Id.*; Doc. 98-1 at 17-18.)[6]  Plaintiffs argue "[t]here is simply no reason for

26

27   _____

     [6]     That Solomon, a male employee, made drinks for the group is consistent with
     Christley's testimony that "the drink orders were being exchanged with" a "bartender
28   [who] was male." (Doc. 98-1 at 9.)  None of the other staff Hillstone disclosed as potential
     eyewitnesses were male.

[Hillstone] not to have disclosed [Solomon and Bralich], unless they have unfavorable information – i.e. they knew Lewis Nyerges was obviously intoxicated and/or disorderly." (Doc. 89 at 10.)   Plaintiffs seek one of two forms of relief for the failure to disclose Solomon and Bralich: (1) strike Hillstone's answer and enter default judgment in Plaintiffs' favor; or (2) "find as fact that [Solomon] and/or [Bralich] knew that Lewis Nyerges was obviously intoxicated." (*Id.*)

In its written response,[7] Hillstone provides three counterarguments: (1) it acted reasonably and in good faith in identifying persons with knowledge of relevant facts, because it "disclosed all Bandera employees with documented information related to the group's bar and table tickets on the subject evening (or on the audit report)" and had no obligation "to identify every employee working that night" (Doc. 98 at 9-10); (2) the late identification of Solomon and Bralich was harmless (*id.* at 10); and (3) Plaintiffs' own inadequate follow-up is to blame for the lack of disclosure (*id.* at 8-9).  As to the final point, Hillstone elaborates that Plaintiffs first learned about Nyerges's party interacting with an unidentified male bartender during Christley's testimony in December 2019, nine months before Banuelos's testimony and the close of discovery, yet did nothing. (*Id.*)  Hillstone further argues that, even when they learned of Solomon and Bralich six days before the close of discovery, Plaintiffs failed to follow up regarding these individuals, seek an extension of the discovery period, or otherwise make any effort to cure the defect in discovery. (*Id.* at 8.)

Plaintiffs reply that after they learned Nyerges's party may have been served by a male bartender, they "sent a request for the name of each employee on duty that evening, their position, and their duties," but Hillstone's response did not identify Solomon or Bralich (or any male bartender). (Doc. 107 at 7, citing Doc. 89-15 at 2.)  Plaintiffs thus argue they did not fail to act on information about the male bartender, but rather reasonably relied on a disclosure that later turned out to be incomplete and misleading. (*Id.* at 7-8.)

---

[7]     As discussed below, Hillstone proffered several additional defenses and justifications during oral argument (some of which are difficult to reconcile with Hillstone's written arguments).

3.      Analysis

a.      **Did Hillstone Violate The MIDP?**

As noted, Hillstone was required under the MIDP to disclose the names of all persons believed to be likely to have discoverable information "relevant to *any party's* claims or defenses," as well as description of the nature of the information each such person was believed to possess, and also had a continuing duty to supplement its responses when new or additional information was discovered or revealed.  D. Ariz. G.O. 17-08 ¶¶ A-B.  These disclosure requirements are broader than the requirements set by Rule 26(b)(1)(A)(i), which only requires the disclosure of witnesses that "*the disclosing party* may use to support *its* claims or defenses."  *Id.* (emphasis added).

With this understanding in mind, the Court finds that Hillstone violated the MIDP by failing to disclose the names of, and information relating to, Solomon and Bralich.  In its written response to the sanctions motion, Hillstone conspicuously did not claim that it was unaware of Solomon's and Bralich's existence until Banuelos's deposition.  Rather, Hillstone seemed to take the position that satisfied its MIDP disclosure obligations by "identif[ying] the names of all Bandera employees whose names appeared on the receipts from the subject evening."  (Doc. 98 at 5.)  But this approach merely justifies the subset of witnesses Hillstone did disclose and does not provide justification for failing to disclose Solomon and Bralich.  A percipient witness remains a percipient witness even if there is no paper trail establishing the witness's presence.  Moreover, the MIDP specifically provides that a "party is not excused from providing its response because it has not fully investigated the case."  D. Ariz. G.O. ¶ A.3.

The justification for failing to disclose Solomon and Bralich set forth in Hillstone's response brief is particularly problematic in light of admitted facts about Bandera's service model.  As the record reflects and Hillstone elsewhere acknowledges (Doc. 98 at 7; Doc. 98-1 at 14), Bandera employs a "team-service" approach, meaning that even though one employee is assigned to a certain party, any one of Bandera's servers, managers, or bartenders might interact with a party to assist in providing service.  In light of this service

model, it is clearly possible that some Bandera staff other than those whose names appear on written sales records might have taken drink orders from and/or served or otherwise interacted with Nyerges or his party. Thus, disclosing only those employees whose names appear in documentary evidence actually weighs against concluding the nondisclosure was justified, because without proper MIDP disclosure these witnesses' identities might forever escape notice and their testimony might never become available.

In any event, Hillstone's written argument misconstrues its obligations under the MIDP. The MIDP does not mandate that a party disclose a select number of individuals it knows to have relevant information. Rather, the MIDP requires the disclosure of "all persons" a party believes are "likely to have relevant information." D. Ariz. G.O. 17-08 ¶ B.1. It may have been reasonable for Hillstone to decide that it need not disclose every single person who was working at Bandera that evening, because presumably the dish-washers, cooks, or other non-service staff would be unlikely to have relevant information, but it makes no sense for Hillstone to claim it reasonably concluded that two of the bartenders working on the evening at issue in a dram-shop action likely did not have relevant information.

Further, the Court disagrees with Hillstone's characterization of Banuelos's deposition testimony regarding Solomon and Bralich. Hillstone argues that Banuelos "did not . . . testify that she had a distinct memory of someone else serving Mr. Nyerges, as it was possible (because of the team service approach) that one of the other bartenders served him. It is thus equally possible Ms. Banuelos did serve the group . . . but does not now remember." (Doc. 98 at 7.) Hillstone continues, "[Banuelos] identified two other bartenders . . . working in the bar with her and could have possibly served the group." (*Id.*)

The Court construes Banuelos's testimony differently. The relevant passage from the deposition transcript reads:

> Q.   Okay. What you told me was that you believe another bartender did make drinks for Mr. Lewis and his party while they were still at the bar. Is that right?

| 1 | A. | Yes. |

A.      Yes.

Q.      Got it.  Do you remember the name of the bartender who made drinks for Mr. Lewis and his party after Mr. Lewis got there?

A.      Dezman and Alyssa.

. . .

Q.      Got it.  Thank you.  Do you happen to know Alyssa's last name?

A.      Bralich, B-R-A-L-I-C-H.

Q.      Thank you.  Do you happen to know Dezman's last name?

A.      Solomon.

(Doc. 98-1 at 17-18.)  Although Hillstone is of course correct that Banuelos might have misremembered who actually made the drinks that evening, Banuelos did not merely testify that "it was possible" that someone else made drinks for Nyerges or identify two other bartenders who "could have possibly" made drinks for the group.  Banuelos testified quite straightforwardly that she believed two other bartenders made drinks for Nyerges and his party and then identified them by first and last name.

During oral argument, Hillstone proffered several additional justifications and explanations for its failure to disclose Solomon and Bralich.  Most notably, Hillstone emphasized that Banuelos used the phrase "made drinks for" when describing Solomon's and Bralich's role on the night in question.  According to Hillstone, this is different from saying that Solomon and Bralich "served" drinks to Nyerges and shows that Solomon and Bralich never interacted with Nyerges or had an opportunity to observe his level of intoxication (which, in turn, explains why Hillstone did not disclose Solomon and Bralich as witnesses likely to possess relevant knowledge).  Specifically, Hillstone's counsel argued: "[T]here is a significant difference between ordering a drink from somebody [who] can take an order and it gets entered into a computer [and] what they sometimes call a line bartender who is just sitting back on the U shape [bar] making drinks. . . .  [Plaintiffs'] questions to [Banuelos] all involved making drinks, not serving drinks."  Later, Hillstone's counsel added: "Miss [Banuelos] remembers that they may have made the drinks, the line bartenders.  Not served them, made them."

1    There are three problems with this argument.  First, it is inconsistent with the

2  arguments set forth in Hillstone's written response to the sanctions motion.  There,

3  Hillstone acknowledged that Banuelos testified that "it was possible (because of the team

4  service approach) that one of the other bartenders *served* him [Nyerges]" and that "two

5  other bartenders [Solomon and Bralich] . . . could have possibly *served* the group."  (Doc.

6  98 at 7, emphases added.)   The Court agrees with Hillstone's written response that

7  Banuelos's testimony may fairly be characterized as discussing which of the bartenders

8  "served" Nyerges and his party.  At any rate, having conceded in its motion papers that

9  Banuelos's deposition testimony establishes that Solomon and Bralich may have "served"

10  drinks to Nyerges, Hillstone cannot take the opposite position at oral argument.

11    Second, in a related vein, Hillstone's belated attempt to claim that Solomon and

12  Bralich merely "made drinks for" Nyerges, but did not "serve" or otherwise interact with

13  him, is also difficult to reconcile with Hillstone's MIDP disclosures.  On August 31, 2020,

14  shortly after a discovery dispute in which Plaintiffs specifically questioned the

15  thoroughness and adequacy of Hillstone's disclosures concerning the identity of the

16  employees who interacted with Nyerges on the night in question (Docs. 67, 71, 73, 75),

17  Hillstone revised its description of Banuelos's anticipated testimony to add that that she

18  was "expected to testify [that] Mr. Nyerges's group *ordered drinks at the bar from the*

19  *bartenders* and that Mr. Nyerges paid for the drinks at the bar there."  (Doc. 89-7 at 1,

20  emphasis added.)  This language, which did not appear in the six previous versions of

21  Hillstone's MIDP disclosures,[8] further undermines Hillstone's contention at oral argument

22  ─────────────────

23  [8]    This language did not appear in earlier iterations of Hillstone's MIDP disclosures.

24  (Doc. 89-1 at 1 [initial disclosure in May 2019: description of Banuelos's anticipated
testimony does not include any discussion of "order[ing] drinks at the bar from the
bartenders"]; Doc. 89-2 at 1-6 [first supplemental disclosure in January 2020: Banuelos not

25  identified as a person likely to have discoverable information]; Doc. 89-3 at 1-5 [second
supplemental disclosure in February 2020: no additional discussion of Banuelos]; Doc. 89-
4 at 1 [third supplemental disclosure in June 2020: description of Banuelos's anticipated

26  testimony does not include any discussion of "order[ing] drinks at the bar from the
bartenders"]; Doc. 89-5 at 1 [fourth supplemental disclosure on August 11, 2020:
description of Banuelos's anticipated testimony does not include any discussion of

27  "order[ing] drinks at the bar from the bartenders"]; Doc. 89-6 at 1 [fifth supplemental
disclosure on August 19, 2020: description of Banuelos's anticipated testimony does not

28  include any discussion of "order[ing] drinks at the bar from the bartenders"].

that Solomon's and Bralich's role was limited to making a drink order that Nyerges had placed with a different employee—to the contrary, it suggests that Solomon and/or Bralich took Nyerges's drink order at the bar (and, thus, had the ability to observe his level of intoxication).

Third, having carefully re-reviewed Banuelos's testimony in light of Hillstone's statements during oral argument, the Court is unpersuaded by Hillstone's theory that she merely identified Solomon and Bralich as individuals who "made drinks for," but did not otherwise serve or interact with, Nyerges and his party.  Before providing the names of Solomon and Bralich as outlined above, Banuelos was asked what she remembered about Nyerges and his four dining companions.  (Doc. 107-1 at 2.)  She recalled that "there was a group waiting for one person" that "got drinks," and that when the one person (Nyerges) showed up later, they got more drinks, "but I wasn't around during that time for the drinks, the other drinks we made."  (*Id.*)  Later, Banuelos clarified that she made drinks for the party before Nyerges arrived, but that after Nyerges arrived, she "didn't make any more drinks for them, but [her] other bartenders did," and later that she did not remember making any drinks for the group after Nyerges's arrival.  (*Id.* at 4.)  She later stated that she did not recall speaking with Nyerges or otherwise interacting with Nyerges or his party.  (*Id.* at 6-7.)  Read in context, then, Banuelos's testimony indicates, at a minimum, that she may have had some level of interaction with Nyerges's group before his arrival, but after his arrival she did not, because Solomon and Bralich were the ones who made the party's drinks after Nyerges arrived.  In other words, Banuelos's testimony indicates that there is a connection between making drinks for a party and interacting with them.

During oral argument, Hillstone also suggested that it shouldn't be held responsible for the failure to disclose Solomon and Bralich because their names never came up during its investigation and Banuelos's identification of them during her deposition came as a surprise to everybody: "In litigation these things happen.  We investigate, disclose and . . . a year later like in this case, more information comes out."[9]  Once again, the problem with

---

[9]   Hillstone's counsel made further statements to this effect during oral argument, including "[b]ased on my investigation, which including speaking with Miss [Banuelos], I

this argument is that it is different from the position Hillstone took in its motion papers and difficult to reconcile with other evidence in the record. As discussed, Hillstone took the position in its motion papers that it was justified in not disclosing Solomon and Bralich because their names didn't appear on the any of the paperwork associated with the Nyerges party's drink orders, not because it was subjectively unaware (until Banuelos's deposition) of their involvement in the events in question. It is impermissible for Hillstone to attempt to raise a new, and seemingly contradictory, defense theory for the first time during oral argument. *See, e.g., Szczesny v. Ashcroft*, 358 F.3d 464, 465 (7th Cir. 2004) ("[A]rguments made for the first time at oral argument are waived . . . ."); *S.A. Storer & Sons Co. v. Sec'y of Labor*, 360 F.3d 1363, 1371 n.20 (D.C. Cir. 2004) (noting the impropriety of raising an issue for the first time during oral argument, particularly where the offering party's "brief tends to contradict the position . . . [taken] at oral argument").

Hillstone's "surprise" theory also appears to be inconsistent with the chronology established by Hillstone's MIDP disclosures. As noted, although Hillstone's disclosures between May 2019 and mid-August 2020 made no mention of any bartenders taking a drink order from Nyerges at the bar, Hillstone amended its disclosures on August 31, 2020 to add a notation to this effect. Although other explanations are possible, the inference arising from this change is that Hillstone learned in August 2020, through its own investigatory efforts, about these bartenders' role and involvement. (During oral argument, Hillstone's counsel was provided an opportunity to provide a different explanation for the timing of the August 31, 2020 amendment and was unable to do so.) This further undermines the notion that Hillstone didn't learn, until Banuelos's deposition in September 2020, of Solomon's and Bralich's role.[10]

believed that she was the shooting match, if you'll excuse the expression. That she did it. I honestly never knew or did not know she was going to suggest at her deposition that somebody else had made the drinks. Made. I didn't know that."

[10]     It should be noted that, although this order identifies waiver and contradiction with the record as separate reasons why Hillstone's "surprise" theory lacks merit, those reasons are interrelated in some respects. Had Hillstone timely raised its "surprise" theory in its response brief, it could have supported its position with a declaration from counsel avowing that Hillstone did not become aware of Solomon and Bralich until Banuelos's deposition. Here, there is no such declaration. Instead, the Court is being asked to rely on Hillstone's

1    After trying (without success) to justify the nondisclosure, Hillstone attempts to

2  shift the blame to Plaintiffs.  Hillstone argues that Plaintiffs first "learned of the possibility

3  of another bartender" during the December 2019 Christley deposition, wherein Christley

4  said "I believe the bartender was male . . .  There was a male and a female bartender."

5  (Doc. 98 at 6; Doc. 98-1 at 9.)  Hillstone faults Plaintiffs for doing "nothing" in response

6  to this revelation.  (Doc. 98 at 6, 8-9.)

7    This argument fails.  First, "[t]hat another witness has made a passing reference in

8  a deposition to a person with knowledge or responsibilities who could conceivably be a

9  witness does not satisfy a party's disclosure obligations."  *Ollier v. Sweetwater Union High*

10  *Sch. Dist.*, 768 F.3d 843, 863 (9th Cir. 2014).  This is true even where the undisclosed

11  witness's name is mentioned in the deposition.  *Cf. id.* ("There was no error in the district

12  court's conclusion that the mere mention of a name in a deposition is insufficient to give

13  notice to Plaintiffs that Sweetwater intend[ed] to present that person at trial.") (internal

14  quotation marks omitted) (alteration in original).  Here, Christley merely referenced "a

15  male and a female bartender."  Plaintiffs were not given sufficient notice of the identities

16  of Solomon and Bralich by Christley's statement that one of the bartenders who served the

17  group was male.

18    Further, Plaintiffs sought to follow up on this exact testimony by serving an

19  interrogatory on Hillstone seeking the identities of all staff working on the evening in

20  question.  (Doc. 89-15 at 2 ¶ 2.)  In response, Hillstone objected to the breadth of this

21  request and listed a smaller number of personnel who, according to Hillstone, actually

22

23  counsel's representations on this issue during oral argument.  Although the Court has no
reason to doubt the veracity and sincerity of counsel, it is hornbook law that arguments of
24  counsel are not evidence.  *See, e.g., Carrillo–Gonzalez v. I.N.S.*, 353 F.3d 1077, 1079 (9th
Cir.2003) ("[T]he record contains no evidence that Carrillo-Gonzalez was in any way
25  defrauded by a notary; Carrillo-Gonzalez forwards this claim solely through the argument
of her counsel, which does not constitute evidence."); *FW/PBS, Inc. v. City of Dallas*, 493
26  U.S. 215, 235 (1990) ("We do not rely on the city's representations at argument [because]
the necessary factual predicate may not be gleaned from the briefs and arguments
27  themselves.") (citation and internal quotation marks omitted).  Additionally, had Hillstone
attempted to develop this argument in its response brief, Plaintiffs would have had a
28  corresponding ability to address, in their reply, the seeming contradiction between the
surprise theory and the chronology of Hillstone's MIDP disclosures.

interacted with Nyerges and his party.  (*Id.*)  Hillstone argues that Plaintiffs "never complained to Hillstone that additional bartenders' identity might be missing from Hillstone's discovery responses or that they were otherwise deficient," so it is too late for Plaintiffs to complain now.  (Doc. 98 at 9.)  The Court agrees that Plaintiffs could have been more diligent in discovering relevant information about who served Nyerges and his party, as discussed in more depth below.  Nonetheless, Hillstone once again misapprehends the MIDP, which places the onus on *Hillstone* to identify all persons believed to have relevant information.[11]  Hillstone seems to take the position that, under the MIDP, it may offer circumscribed and misleading disclosures until another party complains.  But this approach flies in the face of the MIDP's plain commands.  D. Ariz. G.O. 17-08 ¶ C.1(b) (listing among the "key features" of the MIDP that "responses must be based on information reasonably available to the parties as of the time they are made, *and must be timely supplemented as additional relevant information becomes available*") (emphasis added).  If it is assumed that Christley's December 2019 testimony about the male bartender put Plaintiffs on notice, then Hillstone too, by that date, was aware that another bartender may have served (or at least taken an order from) Nyerges.  Hillstone's failure to supplement its MIDP disclosures in light of this information means that if December 2019 was in fact the first time the parties became aware of other bartenders, Hillstone is to be faulted at least as much as Plaintiffs for failing to inquire about these individuals and disclose their identities.  Notably, even after Banuelos revealed Solomon's and Bralich's identities, Hillstone did not, on its own initiative, supplement its MIDP disclosures with this information, as it was required to do.  *Cf. Leland v. County of Yavapai*, 2019 WL 1547016, *4 (D. Ariz. 2019) ("While the timing of the contact and disclosure may have complied with [Rule 26], absent MIDP, here, MIDP required that defense counsel try to make the contact and disclosure earlier in the discovery/disclosure window and in time for Plaintiffs to decide whether or not to depose Ms. Hoffman.").

---

[11]     Hillstone's argument also proves too much.  If Plaintiffs are to be faulted for not complaining enough about Hillstone's disclosures, what does that say about the adequacy of Hillstone's disclosures?

1    Hillstone's final argument is that the late identification of Bralich and Solomon was

2 harmless "because if truly necessary" discovery can be reopened "to allow Plaintiffs to

3 locate and depose the two bartenders." (Doc. 98 at 10.)  There are at least three problems

4 with this argument.

5    First, it once again misunderstands Hillstone's obligation under the MIDP to

6 affirmatively disclose witnesses, including their contact information, rather than foist the

7 burden on the opposing party to identify and track down them down.  Solomon and Bralich

8 are Hillstone's current or former employees, whose current or former contact and

9 identifying information are presumably more available to Hillstone than Plaintiffs.

10    Second, Hillstone's argument is not so much that its failure was harmless, but that

11 the harm can be cured.  But the question of what action is appropriate to remedy the harm

12 caused by a discovery violation is a question about the appropriate sanction, not the

13 antecedent question of whether a discovery violation occurred.  This issue is taken up

14 further below, but the Court notes that it is unpersuaded that reopening discovery is a

15 sufficient remedy under the circumstances.

16    Third, Hillstone offers circular arguments in an attempt to minimize the harm caused

17 by the nondisclosure.  Although Hillstone emphasizes that "[t]here is no eyewitness

18 testimony that Mr. Nyerges was obviously intoxicated at the bar before dinner" (Doc. 98

19 at 4), this begs the question of what the two missing eyewitnesses, Solomon and Bralich,

20 would say about Nyerges's level of intoxication.

21    In short, the Court finds that Hillstone's failure to disclose Solomon and Bralich has

22 caused potentially serious harm.  Although the harm *might* be cured by deposing Solomon

23 and Bralich, much time has passed between the underlying incident, the filing of this case,

24 the close of the discovery, and the resolution of the sanctions motion.  So even if Solomon

25 and Bralich could be deposed, there is residual harm—in the form of stale or forgotten

26 memories and the costs and difficulties of tracking down the two bartenders—from the

27 long delay caused by Hillstone's disclosure violations.  *Cf. Ollier*, 768 F.3d at 863 ("The

28 record demonstrates that the district court's conclusion, that reopening discovery before

trial would have burdened Plaintiffs and disrupted the court's and the parties' schedules, was well within its discretion."); *Green v. Baca*, 226 F.R.D. 624, 655 (C.D. Cal. 2005) (plaintiff's failure to disclose witness not harmless where defendant had access to witness but at "late stage in the proceedings" did not have the opportunity to conduct discovery regarding the witness). *Compare Van Maanen v. Youth With A Mission-Bishop*, 852 F. Supp. 2d 1232, 1236-37 (E.D. Cal. 2012) (nondisclosure of witness harmless where "his identity, position, location, and the subject of the information he possessed were made known" in depositions over two months before close of discovery); *Goodworth Holdings Inc. v. Suh*, 239 F. Supp. 2d 947, 967 (N.D. Cal. 2002) (defendant's failure to identify witness in initial disclosures was harmless where plaintiff was given opportunity to depose witness and cited deposition testimony in its summary judgment motion).

Because Hillstone's failure to disclose Solomon and Bralich violated the MIDP, Hillstone is subject to Rule 37(b) sanctions.

### b.    **Appropriate Sanction**

Plaintiffs ask the Court to strike Hillstone's answer and enter default judgment, or, in the alternative, to "find as fact that [Solomon] and/or [Bralich] knew that Lewis Nyerges was obviously intoxicated."  (Doc. 89 at 10.)

The Court will not impose the sanction of striking Hillstone's answer and entering default judgment for Plaintiffs.  "[P]reclusive sanctions, such as dismissal of a case or entry of judgment against a party, are disfavored." *Ritchie v. United States*, 451 F.3d 1019, 1026 (9th Cir. 2006).  "A court must consider the following five factors before striking a pleading or declaring default: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1169 (9th Cir. 2012) (internal quotation marks omitted).  To enter judgment in Plaintiffs' favor, "a finding of willfulness, fault, or bad faith is required." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks omitted).  "Additionally, the district court must

1    consider less severe alternatives than outright dismissal." *Id.* (internal quotation marks

2    omitted).

3        Although Hillstone's failure to disclose Solomon and Bralich is sanctionable, it is

4    not sufficiently egregious or prejudicial to trigger a case-terminating sanction.  The first

5    three factors may weigh somewhat in favor of a terminating sanction, but the final two

6    factors weigh strongly against it.   In particular, less drastic sanctions are available.

7    Additionally, Plaintiffs did not act after Banuelos disclosed Solomon and Bralich six days

8    before the close of discovery.  Although this disclosure came late, at that point Plaintiffs

9    still could have sought an extension of the discovery deadline and to depose Solomon and

10   Bralich.  Such a reaction could have cured the prejudice caused by Hillstone's failure to

11   disclose, and Plaintiffs are to be faulted, to an extent, for failing to seek this targeted remedy

12   and instead using the issue as a springboard for seeking terminating sanctions.

13       With that said, the Court still concludes that Hillstone's conduct merits a serious

14   sanction.  It is hard to reconstruct a good reason for Hillstone's failure to disclose Solomon

15   and Bralich, and Hillstone ultimately fails to offer one.  Fact discovery in this case lasted

16   roughly 16 months.  (Docs 8, 16, 79.)  Plaintiffs specifically requested this information via

17   interrogatory.  (Doc. 89-15 at 2 ¶ 2.)  Plaintiffs also repeatedly questioned the sufficiency

18   of Hillstone's MIDP disclosures, leading Hillstone's counsel to repeatedly assure the

19   Court, in response to pointed questioning, that the disclosures were comprehensive and

20   accurate.   (Doc. 103 at 1-2 ["Hillstone's counsel twice avowed that all of the facts

21   contained in the witness statements have been conveyed to Plaintiffs through witness

22   deposition testimony or through Hillstone's [MIDP] disclosures."].)  And it would not be

23   difficult to determine that Solomon and Bralich worked on the night in question—Hillstone

24   seemed to have little difficulty identifying other relevant persons, and, as Plaintiffs point

25   out, Banuelos recalled the first and last names of the two bartenders without difficulty.

26       As for the determination of the appropriate sanction, which is an area in which

27   "[d]istrict [c]ourts have broad discretion," *Ritchie*, 451 F.3d at 1026, the Court orders as

28   follows.

First, it is to be taken as established that Solomon and/or Bralich bartended at Bandera on the night in question and interacted with Nyerges and his party.  The only evidence in the record regarding the identities of the persons who were involved in taking orders for, making, and/or serving alcoholic drinks to Nyerges and his party at the bar comes from Banuelos and Christley.  Christley testified that Nyerges "exchanged" his drink order with a "male" "bartender" (Doc. 98-1 at 9), and this description would match Solomon and no other witness in this case, because all of the disclosed Bandera employee witnesses are female, with the exception of Hillstone's Rule 30(b)(6) witness.  (Doc. 98-1 at 9; Doc 89-7 at 1-4.)  Meanwhile, Banuelos testified unambiguously that Solomon and Bralich "made drinks" for Nyerges and his party (Doc. 98-1 at 17-18), and as discussed above, it is logical for a host of reasons—including the context of Banuelos's questioning, the concessions in Hillstone's response to the sanctions motion, the statements in Hillstone's August 31, 2020 MIDP disclosure, and Christley's testimony—to conclude that the drink-making process included some opportunity to interact with Nyerges and observe his level of intoxication.  Accordingly, that Solomon and/or Bralich interacted with Nyerges and his party at the bar is effectively uncontroverted and must be taken as so.

Second, the jury may, but is not required to, infer that Solomon and/or Bralich observed that Nyerges was obviously intoxicated.  Hillstone may try to persuade the jury that Solomon and/or Bralich did not observe Nyerges being obviously intoxicated.  But Plaintiffs may argue, based on all the facts and circumstances—including the fact that Solomon's and Bralich's testimony is unavailable because Hillstone failed to disclose their identities—that Solomon and Bralich formed the impression that Nyerges was, in fact, obviously intoxicated.

In reaching this conclusion, the Court has considered both the greater sanctions requested by Plaintiffs and the lesser sanctions proposed by Hillstone.  As discussed above, the Court rejects the sanction of entering judgment against Hillstone.  (Such a sanction would be particularly inappropriate because, as discussed in more detail below, there are significant questions about the adequacy of Plaintiffs' causation evidence, so granting

terminating sanctions would result in a windfall.)  It would also be inappropriate to take as an established fact that Solomon and Bralich knew Nyerges was obviously intoxicated (which is the sanction that Plaintiffs' counsel requested during oral argument).  The Court and the jury will remain unaware of Solomon's and Bralich's testimony in part because of Plaintiffs' own failures, and therefore such a strong sanction would unfairly prejudice Hillstone.

On the other hand, Hillstone's proposal to reopen discovery for the purpose of deposing the two bartenders is inappropriate.  More than three years have elapsed since the night of Nyerges's fatal accident, and it has now been roughly ten months since the close of discovery.  (Doc. 79.)  At this point, memories have likely faded to a considerable degree.  Further, it would cause undue delay to reopen discovery now, attempt to find both bartenders, and schedule and take depositions.  *Cf. Ollier*, 768 F.3d at 863.  Such an approach would also inadequately deter Hillstone's discovery violation.  (Doc. 8-2 at 6 ¶ C.1.(h) ["Courts should remember that the effectiveness of the MIDP will depend significantly on the willingness of judges to impose real consequences on parties who fail to comply with their mandatory discovery obligations."].)

*Dreschel v. Liberty Mutual Insurance Co.*, 2015 WL 7067793 (N.D. Tex. 2015), cited by Hillstone, is distinguishable.  In *Dreschel*, the defendant objected to the plaintiff's designation of 28 previously undisclosed witnesses on the last day of discovery and sought either to strike the witnesses or to reopen discovery so the new witnesses could be investigated and deposed.  *Id.* at *1.  The court concluded that the disclosures were untimely, but some of them were substantially justified or harmless, and for all the late-disclosed witnesses, whatever prejudice existed could be cured by reopening discovery and allowing the witnesses to be deposed.  *Id.* at *2-4.  There are at least four important differences between *Dreschel* and this case.  First, *Dreschel* was decided under Rule 26, not the MIDP, and as noted above, the MIDP requires parties to timely disclose all witnesses with relevant information, not only those upon whom the party plans to rely.  *Id.* at *2.  Another of the "key features" of the MIDP is the requirement to supplement this

information as it becomes available.  (Doc. 8-2 at 2 ¶ C.1(b).)  So the burdens on Hillstone in this instance are greater than those in *Dreschel*.  Second, the posture of *Dreschel* was different: the disobedient party failed to timely disclose witnesses *it* sought to use.  2015 WL 7067793 at *1-4.  Here, Hillstone withheld the identify of its own employees, who might have otherwise supplied critical information that would support Plaintiffs' claims.  Third, in *Dreschel*, the disobedient party did disclose the witnesses, albeit on the last day of discovery.  *Id.* at *1.  Here, on the other hand, even after Banuelos informed Plaintiffs about Solomon and Bralich, Hillstone never supplemented its MIDP disclosures to provide any information about them.  So Hillstone's conduct is more sanctionable than the conduct in *Dreschel*.  Finally, less time had elapsed in *Dreschel* than has elapsed in this case, so the lesser remedy of reopening discovery is less practical here.  *Id.*

Finally, there is no merit to Hillstone's contention, made during oral argument, that sanctions are unwarranted because the "idea that we're trying to nefariously hide something is just not fair . . . [and] doesn't make any sense," as "we know [Banuelos] going to be deposed" so it "would be a silly foolish move if that's the stunt we were trying to . . . pull here."  Regardless of why the disclosure violation occurred, it occurred, and it was prejudicial to Plaintiffs.  Rule 37(b)(2) authorizes the imposition of a permissive adverse-inference sanction in this circumstance to level the playing field.

## II.   Summary Judgment

Plaintiffs' complaint asserts two counts: (1) a statutory dram-shop violation brought under A.R.S. § 4-311 and (2) negligence in the service of alcohol and the training of staff in relation to the same.  (Doc. 1 at 25-26 ¶¶ 26-35.)  Hillstone moves for summary judgment on both counts.  (Doc. 96 at 7.)  Hillstone argues that neither statutory dram-shop liability nor common-law negligence can be established because there is insufficient evidence for a reasonable jury to conclude (1) that Nyerges was "obviously intoxicated" while at Bandera and/or (2) that Bandera's service of alcohol caused Nyerges's choking.  (*Id.* at 8-14.)  Hillstone also contends that one of the plaintiffs should be dismissed due to a pleading deficiency.  (*Id.* at 15-16.)

1

### A.   **Legal Standard**

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all

justifiable inferences are to be drawn in his favor." *Id.* at 255.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.  Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

B. **Analysis**

1. <u>Statutory Dram-Shop Liability</u>

a. **Applicable Arizona Law**

"In determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court.  If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict how the state high court would resolve it." *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) (citation and internal quotation marks omitted).  "The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis." *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir. 1989).

In 1983, the Arizona Supreme Court reversed decades of precedent and held that "those who furnish liquor have an obligation or 'duty' to exercise care for the protection of others." *Ontiveros v. Borak*, 667 P.2d 200, 211 (Ariz. 1983).  This includes the duty to exercise reasonable care "in furnishing liquor to those who, by reason of immaturity or previous over-indulgence, may lack full capacity of self-control and may therefore injure themselves, as well as others." *Brannigan v. Raybuck*, 667 P.2d 213, 216 (Ariz. 1983).

A few years later, the Arizona legislature enacted A.R.S. § 4-311.  *McMurtry v. Weatherford Hotel, Inc.*, 293 P.3d 520, 533 (Ariz. Ct. App. 2013).  Section 4-311(A) provides that a tavern owner—in the parlance of § 4-311(A), a "licensee"—may be civilly liable for property damage, personal injury, or wrongful death if a court or jury finds all of the following:

1.      The licensee sold spiritous liquor either to a purchaser who was
obviously intoxicated . . . .

2.      The purchaser consumed the spiritous liquor sold by the licensee.

3.      The consumption of spiritous liquor was a proximate cause of the
injury, death, or property damage.

*Id.*

### b.      **Obvious Intoxication**

#### i.      Legal Standard

The term "obviously intoxicated" is defined by statute as "inebriated to such an extent that a person's physical faculties are substantially impaired and the impairment is shown by significantly uncoordinated physical action or significant physical dysfunction that would have been obvious to a reasonable person." *See* A.R.S. § 4-311(D).

#### ii.      The Parties' Arguments

Hillstone argues there is "no evidence, let alone sufficient evidence, for a reasonable juror to conclude that Mr. Nyerges was 'obviously intoxicated' at Bandera." (Doc. 96 at 9.)  Hillstone claims that "none of the Bandera employees observed any obvious signs of intoxication," nor did Christley, Stephanie Christley, Michelle Littlefield, or Jay Littlefield. (*Id.* at 9-11.)  All of the deposition testimony, according to Hillstone, indicates that those who witnessed Nyerges that evening thought that Nyerges appeared normal and did not exhibit any "significantly uncoordinated physical action or significant physical dysfunction." (*Id.* at 10.)

Plaintiffs respond that, viewing the evidence in the light most favorable to them, there are many facts in the record that could reasonably support the conclusion that Nyerges was obviously intoxicated while at Bandera, including his BAC and the conclusions of one of Plaintiffs' proposed expert witnesses about the expected signs and symptoms of somebody at Nyerges's level of intoxication. (Doc. 112 at 11-14.)  Plaintiffs further argue that there is sufficient evidence in the record to question the credibility of certain witnesses, and that because witness credibility questions are for the jury, summary judgment on obvious intoxication would be improper. (*Id.* at 10-11.)

1    In reply, Hillstone argues that the Court need not weigh any witness credibility to

2    rule in its favor, but simply must acknowledge the lack of evidence supporting liability.

3    (Doc. 115 at 2-3.)  Hillstone also questions the materiality of the factual disputes identified

4    by Plaintiffs, arguing they are based on "conjecture and speculation" rather than evidence,

5    as well as the "subjective conclusion[s]" of certain witnesses.  (*Id.* at 3-4.)  Hillstone further

6    argues that Plaintiffs mischaracterize some evidence, and attempt to use Nyerges's reported

7    BACs and expert testimony to draw conclusions about Nyerges's state of intoxication,

8    which on their own are insufficient to demonstrate that Nyerges himself *appeared*

9    obviously intoxicated.  (*Id.* at 4-5.)

10                              iii.    <u>Analysis</u>

11    As a starting point, it is important to identify the types of evidence that are relevant

12    in determining whether a patron was obviously intoxicated.    Arizona courts have

13    determined that actions like "staggering and leaning on a friend," "urinat[ing] on the

14    street," "requir[ing] assistance getting out of [a] car and into [an] apartment," and "slurred

15    speech" may demonstrate that a person is obviously intoxicated.  *Torres v. Jai Dining*

16    *Servs. (Phx.) Inc.*, 476 P.3d 327, 333 n.6 (Ariz. Ct. App. 2020); *Young through Young v.*

17    *DFW Corp.*, 908 P.2d 1, 3 (Ariz. Ct. App. 1995).  Arizona courts have also considered the

18    patron's own recollection of his or her level of intoxication and forensic analysis of the

19    individual's BAC, although a high BAC does not necessarily establish that a person

20    outwardly appeared intoxicated.  *Dupray v. JAI Dining Servs. (Phx.), Inc.*, 432 P.3d 937,

21    942 (Ariz. Ct. App. 2018); *Young*, 908 P.2d at 3 ("Jacobi did not display any obvious

22    physical symptoms of intoxication despite her registering a .20 on the breathalyzer.");

23    *Callender v. Transpacific Hotel Corp.*, 880 P.2d 1103, 1109 (Ariz. Ct. App. 1993).  Courts

24    may also consider whether the patron's own "loud and obnoxious behavior" was

25    attributable to his surroundings, rather than intoxication.  *Callender*, 880 P.2d at 1109.

26    Viewing the evidence in the light most favorable to the Plaintiffs, as the Court must

27    at this stage, Hillstone is not entitled to summary judgment.  Hillstone fairly points out that,

28    when directly asked whether Nyerges showed signs of intoxication at Bandera (such as red

or watery eyes, the smell of alcohol, slurred speech, stumbling, unruly or obnoxious behavior, or inability to carry on a normal conversation), all of the available eyewitnesses testified that he did not.  (Doc. 96-1 at 14-15, 17, 23 [Christley]; Doc. 112-1 at 20 [Christley]; Doc. 96-1 at 32-35 [Stephanie Christley]; *id.* at 43-44, 47 [Jay Littlefield]; *id.* at 56, 58 [Michelle Littlefield]; *id.* at 69 [Gard]; *id.* at 75-76 [Banuelos]; Doc. 96-2 at 17, 23-24 [Waldo]; *id.* at 42 [Brown].)

But other witness statements are more equivocal.  For instance, when asked whether Nyerges was acting in a manner such that an observer would conclude he was impaired, Christley testified that "[i]t's hard to tell what others may have thought. . . .  I know his behavior so closely as to whether he appeared to be drunk, if – if that makes sense."  (Doc. 112-1 at 10-11.)  When asked if Nyerges was having significant physical problems, Christley responded, "[a]t that point, I would say, broken conversation. . . .  So to me, I would have noticed that he's probably getting worse at that point because again, he came in appearing to be already inebriated."  (*Id.* at 11.)  Christley also stated that Nyerges had difficulty totaling his bar tab "[b]ecause he was inebriated."  (*Id.* at 19.)  He further testified that he got the impression that the servers did not bring Nyerges a wine list because "it was best that [Nyerges] not have any more alcohol."  (*Id.* at 15-16.)  Although this might demonstrate that Bandera staff appropriately stopped serving Nyerges after he appeared to be obviously intoxicated, it is starkly inconsistent with Hillstone's argument that none of the fact witnesses thought Nyerges was obviously intoxicated.  Further, the notion that Nyerges only had the two drinks he ordered at the bar and did not drink anything further at the table is disputed, because, as noted above, witnesses gave conflicting accounts of the drinks ordered at the table and there is a receipt showing five drinks being ordered at the table, distinct from the rounds Nyerges purchased at the bar.  And a reasonable factfinder could conclude that, if Nyerges was so obviously intoxicated when he was sitting at the table that the wait staff would not serve him any drinks, he was also obviously intoxicated less than an hour earlier, when it is undisputed that he was allowed to purchase (and consume a portion of) a round of drinks at the bar.

Others similarly testified that Bandera staff avoided serving drinks to Nyerges at the table because they "picked up on something" about Nyerges that made them not want to serve him.  (Doc. 112-1 at 29 [Stephanie Christley].)  Waldo also testified that Nyerges flirted with her and made her uncomfortable.  (Doc. 112-2 at 5.)  Banuelos testified that Nyerges was "very loud and boisterous" when he arrived at Bandera.  (Doc. 112-1 at 54-55.)

This evidence, standing alone, might fall short of the statutory definition of obvious intoxication.  As Hillstone points out, even if Nyerges were making flirtatious comments or being loud and boisterous, this does not suggest he was "inebriated to such an extent" that his physical faculties were "substantially impaired" as by obvious "significantly uncoordinated physical action or significant physical dysfunction."  A.R.S. § 4-311(A).  But other considerations may come into play as well, including that Nyerges could not tally his bill and the raw fact of his markedly elevated BAC.

Among the evidence that Plaintiffs submitted in their response was the affidavit of Chester Flaxmayer ("Flaxmayer"), who describes himself as a criminalist with over three decades of practical experience "in the area of forensic breath and blood alcohol determinations and the measurement of drugs in the human system as well as their effects." (Doc. 112-2 at 42.)  Among other things, Flaxmayer estimates Nyerges's BAC upon arrival at Bandera as 0.360 (and 0.366 at the time of the bathroom collapse).  (*Id.* at 50-51 ¶¶ 21, 27.)  These figures are derived from the 0.422% ethyl alcohol level reported from the hospital.  (Doc. 112-2 at 50 ¶ 21; Doc. 112-3 at 22.)  Using this BAC, as well as other medical and testimonial evidence about Nyerges's physical characteristics and the events of that evening, Flaxmayer estimates the approximate number of drinks Nyerges had to drink to reach this BAC, as well as the effects of such a BAC on an average individual. (*See generally id.* at 50-54.)

Hillstone has filed a motion to exclude Flaxmayer's testimony in whole or in part under Federal Rule of Evidence 702 ("Flaxmayer Motion").  (Doc. 93.)  The Flaxmayer Motion is fully addressed in an accompanying order.  For purposes of the motion for

summary judgment, the Court merely notes that the portion of Flaxmayer's testimony that analyzes Nyerges's BAC and its likely effects on Nyerges is admissible because it meets the test for admissibility under Rule 702.  Contrary to Hillstone's assertions, Arizona courts have found that such evidence is relevant in determining obvious intoxication in dram-shop and other contexts.[12]  The Court accordingly may consider Flaxmayer's affidavit in ruling on Hillstone's summary judgment motion and concludes that it further supports denying summary judgment, because it demonstrates that Nyerges's BAC was in fact "markedly elevated" (Doc. 112-3 at 25) and the ways this fact could have manifested in Nyerges's physical symptoms.  The jury may consider this evidence in light of witness testimony and other evidence to determine whether Nyerges was obviously intoxicated.

In short, there are too many factual disputes about the extent of Nyerges's intoxication, how he presented that evening, and whether he was served after the initial two drinks at the bar, for Hillstone to be entitled to summary judgment on the obvious-intoxication issue.  The Court must view the facts in the light most favorable to Plaintiffs and draw all inferences in their favor.  The Court is also mindful that questions about the

---

[12]    *See, e.g.*, *Dupray*, 432 P.3d at 941-42 ("The Duprays presented evidence that JAI did not exercise reasonable care in serving intoxicants to Panameno. . . .  A forensic toxicologist testified that, based on an analysis of the toxicology reports of Panameno's blood after the collision, Panameno's blood alcohol concentration reached 0.10—the point at which a person would become visibly intoxicated—while he was at the club."); *Young*, 908 P.2d at 3 ("Three toxicologists testified that, given her weight of approximately 125 pounds and her .20 blood alcohol concentration after the accident, Jacobi had to have consumed the equivalent of nine to ten drinks in a four-hour period that evening. . . .  Thus . . . from the circumstances, including Jacobi's size and the number of drinks she had consumed, Young might have established a general negligence claim that Keegan's knew or should have known that Jacobi was legally intoxicated . . . ."); *Callender*, 880 P.2d at 1108-09 (discussing role of expert testimony that "based on certain assumed facts and Callender's blood test results at the hospital . . . Callender would necessarily have displayed obvious signs of intoxication when he purchased the 'bucket' of Mai Tais" in upholding jury verdict in favor of tavern owner).  *See also State v. Klausner*, 978 P.2d 654, 658 (Ariz. Ct. App. 1998) ("We accept as a fact it is not possible to precisely quantify the alcohol content of a person's blood at the time the person was driving from a sample taken at a later time without evidence to relate the sample back.  This does not mean, however, that there is *no* relationship between a BAC reading taken within two hours of driving and whether a person's driving was influenced to the slightest degree by alcohol.  In many cases, there will be an obvious relationship.  To use an extreme example, a person who has a BAC of .30 ten minutes after driving was certainly heavily under the influence when they were behind the wheel.  Surely, this would be true whatever the variables that apply and regardless of whether the BAC was rising or falling at the time the test was taken.").

witnesses' views of whether Nyerges appeared obviously intoxicated, whether the witnesses' testimony is credible, and the interaction of these factual disputes with Nyerges's elevated BAC are generally jury questions that should only be resolved on summary judgment in the absence of dispute on these issues. There are sufficient disputes here to survive summary judgment.

To the extent there is any doubt, the permissive-inference sanction discussed above causes the obvious-intoxication issue to tip more decisively in Plaintiffs' favor. If the jury draws this inference, it could reasonably find that Nyerges was obviously intoxicated. This permissive inference, combined with the disputed fact issues outlined above, demonstrate that Hillstone is not entitled to summary judgment on the obvious-intoxication question. *Cf. Kronish v. United States*, 150 F.3d 112, 128 (2d Cir. 1998) ("We do not suggest that the destruction of evidence, standing alone, is enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive summary judgment on that claim. But at the margin, where the innocent party has produced some (not insubstantial) evidence in support of his claim, the . . . destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line. In the absence of such a result, as noted above, the purposes of the adverse inference are eviscerated.") (citation omitted); *Alcantara v. Bodega Latina Corp.*, 2019 WL 11837145, *4 (D. Nev. 2019) ("Alcantara gets the benefit of this adverse-inference instruction for purposes of this motion. And that inference, along with those that can be drawn from the [other proffered evidence]—though likely too thin to carry the day at trial—precludes summary judgment on Alcantara's negligence claim.").

### c.   **Causation**[13]

#### i.   Legal Standard

The "proximate cause" standard applies to Plaintiffs' dram-shop claim under A.R.S. § 4-311. *Torres*, 476 P.3d at 331 n.4 ("[T]o recover under Arizona's 'dramshop statute,' a

---

[13]   The parties should note that, based on their statements during oral argument, the causation analysis that appeared in the tentative ruling has been substantially revamped in this order.

plaintiff must show a licensee sold liquor to an obviously intoxicated person and that person's consumption of the liquor was a proximate cause of the plaintiff's injury."). Arizona courts "unvaryingly define" the proximate cause of an injury as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Robertson v. Sixpence Inns of Am., Inc.*, 789 P.2d 1040, 1047 (Ariz. 1990).  To satisfy this standard, the "defendant's act or omission need not be a 'large' or 'abundant' cause of the injury; even if defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct." *Id.*  A plaintiff "need only present probable facts from which the causal relationship reasonably may be inferred," and the question of proximate cause is "[o]rdinarily . . . a question of fact for the jury." *Id.*  "Only when plaintiff's evidence does not establish a causal connection, leaving causation to the jury's speculation, or where reasonable persons could not differ on the inference derived from the evidence, may the court properly enter" summary judgment in the defendant's favor.  *Id.*  Put another way, "[t]he mere possibility of causation is not enough." *Graffiti-Valenzuela ex rel. Graffiti v. City of Phoenix*, 167 P.3d 711, 717 (Ariz. Ct. App. 2007).[14]

### ii.  The Parties' Arguments

Hillstone argues there is insufficient evidence of causation.  (Doc. 96 at 11-13.) Hillstone emphasizes that Nyerges's cause of death was asphyxiation (*i.e.,* choking on a

---

[14]      Some Arizona courts conceptualize the causation analysis has having "two components: actual cause or 'causation-in-fact,' and proximate or legal cause." *Dupray*, 432 P.3d at 942.  But this formulation is identical in substance to the *Robertson* standard set forth above—that is, (1) the defendant's conduct must have been the but-for cause of the injury and (2) there must not have been an intervening cause of the injury.  *Dupray*, 432 P.3d at 943 ("An act that is the actual cause of injuries will also be the proximate cause unless an intervening event supersedes the defendant's liability for the injuries.").  For this reason, other Arizona courts have stated that the causation-in-fact requirement is simply a component *of* proximate cause, as opposed to a component of the overall causation analysis that is distinct *from* proximate cause.  *See, e.g., Rogers by and through Standley v. Retrum*, 825 P.2d 20, 22 (Ariz. Ct. App. 1991) ("One element of legal cause is 'but-for causation' or causation-in-fact.");*Graffiti-Valenzuela ex rel. Graffiti v. City of Phoenix*, 167 P.3d 711, 717 (Ariz. Ct. App. 2007) (summarizing the holding of *Rogers* as "stating 'causation-in-fact' is required to find proximate cause").  Accordingly, although Hillstone separately analyzed the issues of causation-in-fact and proximate cause in its motion (Doc. 96 at 11-12), and the Court followed the same approach in the tentative ruling, the analysis in this order focuses on the ultimate issue of proximate cause.

piece of meat), not alcohol poisoning, and contends "there is no evidence that 'but for' the drinks that Bandera served him, Mr. Nyerges would not have choked on a piece of meat." (*Id.*)  Hillstone also proffers the opinion of one of its medical experts, Dr. Gary Vilke, who affirmatively concludes that Nyerges's choking "was not caused by behavior related to the Bandera restaurant staff nor his friends who were with him at the table" (Doc. 96-2 at 68-69), and asserts that because "Plaintiffs have no rebuttal expert on medical causation," the "undisputed evidence is simply insufficient on cause-in-fact." (Doc. 96 at 11.)  Finally, Hillstone also contends that causation is lacking because Nyerges's choking was not reasonably foreseeable from the service of alcohol.  (*Id.* at 12-13.)

In their response brief, Plaintiffs offer two counter-arguments.  First, Plaintiffs invoke A.R.S. § 4-244(14), a criminal statute that makes it a misdemeanor to "allow an obviously intoxicated person to remain on the premises for . . . more than thirty minutes after the state of obvious intoxication is known."  Plaintiffs contend that Hillstone's violation of this statutory duty provides the necessary causal link: "Obviously, if [Hillstone] had secured a safe ride home for [Nyerges], rather than permitting him to stay, [he] would not have been there to have a piece of steak get caught in his throat."  (Doc. 112 at 16.)  Second, Plaintiffs seek to proffer the opinion of another one of *Hillstone's* experts, Dr. Alan Donelson.  (*Id.*)  During his deposition in this case, Dr. Donelson made several general statements about the correlation between alcohol consumption and the risk of choking, testifying that "health and safety agencies and organizations have long drawn a connection between alcohol as a possible factor and the risk of choking" and that "an older adult's risk factors for choking include alcohol consumption."  (Doc. 112-2 at 26-30.)  In addition to these general observations, Dr. Donelson also made two somewhat difficult-to-reconcile statements about whether Nyerges's consumption of alcohol was, in fact, a cause of the choking incident in this case.  On the one hand, Dr. Donelson stated that, "more likely than not, [alcohol] was a possible factor" in Nyerges's choking.  (*Id.* at 30.)  On the other hand, Dr. Donelson also stated that, "[w]ithin a reasonable [degree of] scientific certainty, I cannot state that alcohol was a factor."  (*Id.*)  According to Plaintiffs,

1    these statements show that "Defendant's own expert provides causation testimony." (Doc.

2    112 at 16.)  Finally, during oral argument, Plaintiffs identified a third piece of evidence

3    that, in their view, establishes the necessary causal link—the testimony of Stephanie

4    Christley that Nyerges was taking "[u]nusual big bites" of meat just before he choked.

5    (Doc. 96-1 at 37.)

6          Notably, in its reply, Hillstone does not acknowledge (much less address) Plaintiffs'

7    proffer of Dr. Donelson's deposition testimony.  Instead, Hillstone asserts in conclusory

8    fashion that because Dr. Vilke's opinion is "unrefuted and undisputed by Plaintiffs," it

9    follows that summary judgment is warranted.  (Doc. 115 at 6-7.)

10                        iii.    <u>Analysis</u>

11         Plaintiffs' first theory of causation is that Hillstone's alleged violation of the "30

12   minute rule" set forth in A.R.S. § 4-244(14) serves as the proximate cause of Nyerges's

13   choking death.  Although this issue was addressed in only cursory fashion in the parties'

14   briefs (and was not addressed in the tentative ruling), it was addressed at length during oral

15   argument.  Having considered and reflected upon that argument, the Court concludes that

16   the "30 minute rule" issue is a red herring, at least as it pertains to Plaintiffs' statutory claim

17   under A.R.S. § 4-311.  (Whether it may give rise to liability for purposes of Plaintiffs'

18   common-law negligence claim is a separate issued addressed *infra*.)  This is because the

19   one and only category of conduct that may serve as the proximate cause of the injury in an

20   action under § 4-311 is the improper sale and consumption of alcohol.

21         This conclusion is compelled by the plain language of A.R.S. § 4-311, which

22   provides that liability may arise only if "[t]he consumption of spiritous liquor was a

23   proximate cause of the injury, death or property damage."  *Id.* § 4-311(A)(3).  This text, by

24   negative implication, forecloses the possibility that a licensee may be held liable for

25   conduct unrelated to the sale and consumption of alcohol, such as simply allowing an

26   obviously intoxicated person to remain on the premises for more than 30 minutes.  Unless

27   the plaintiff can show that "[t]he licensee sold spirituous liquor . . . to a purchaser who was

28   obviously intoxicated" and "[t]he consumption of spiritous liquor was a proximate cause

- 41 -

of the injury, death or property damage," liability under § 4-311 is unavailable.

Arizona courts have interpreted § 4-311 in this fashion.  In *Petolicchio v. Santa Cruz Cnty. Fair & Rodeo Ass'n*, 866 P.2d 1342 (Ariz. 1994), the Arizona Supreme Court held that "the wording of § 4-311 [was] sufficiently narrow" such that "[f]or dram shop liability to exist under § 4-311, the licensee must sell alcohol to a purchaser who is either intoxicated or under the legal drinking age."  *Id.* at 1350.  The Court further clarified that a claim against a tavern operator not tethered to the sale of alcohol "must stand or fall on basic common-law negligence principles."  *Id.* at 1347.  Similarly, in *Torres*, the Arizona Court of Appeals held that "to recover under Arizona's 'dramshop statute,' a plaintiff must show . . . that [the obviously intoxicated] person's consumption of the liquor was a proximate cause of the plaintiff's injury."  476 P.3d at 331 n.4.  These holdings reinforce the conclusion that Plaintiffs must focus solely on Hillstone's sale of alcohol to Nyerges when he was obviously intoxicated—as contrasted with Hillstone's willingness to allow Nyerges to remain on the premises for more than 30 minutes after observing that he was obviously intoxicated—as the conduct on which Plaintiffs' statutory dram-shop claim is based.

*McMurty v. Weatherford Hotel, Inc.*, 293 P.3d 520 (Ariz. Ct. App. 2013), further supports this conclusion.  There, the Arizona Court of Appeals questioned whether a party may ever invoke the provisions of A.R.S. § 4-244 for purposes of establishing civil liability in a case involving a statutory claim under § 4-311, explaining "[n]othing in the statutory language suggests § 4-244 was meant to substantively affect the application of civil liability under § 4-311."  *Id.* at 534 n.10.  That, of course, is exactly what Plaintiffs are attempting to do here.

Plaintiffs' remaining pieces of causation-related evidence present a much closer question.  As noted, Plaintiffs seek to rely on (1) the somewhat equivocal statements of Hillstone's expert, Dr. Donelson, who agreed that there is a general correlation between alcohol consumption and choking, conceded that alcohol was "more likely than not" a "possible factor" in Nyerges's choking, but refused to say that "alcohol was a factor" "[w]ithin a reasonable [degree of] scientific certainty," and (2) the testimony of a percipient

1    witness who observed Nyerges taking "unusual big bites" just before he choked.  During

2    oral argument, Hillstone placed heavy emphasis on the hedges and qualifications that Dr.

3    Donelson placed on his opinions, arguing that he at most conceded the *possibility* of a

4    causal link and, because "[t]he mere possibility of causation is not enough" under Arizona

5    law, *Graffiti-Valenzuela,* 167 P.3d at 717, it follows that Dr. Donelson's opinions, even

6    when viewed in the light most favorable to Plaintiffs, would be insufficient as a matter of

7    law to prove causation at trial.

8         Hillstone's argument has undeniable force.  In some jurisdictions, it appears that an

9    expert's opinion on causation is not entitled to any weight if it is not expressed with a

10   reasonable degree of scientific certainty.  *See, e.g., Fitzgerald v. Manning*, 679 F.2d 341,

11   350 (4th Cir. 1982) ("[I]n order to qualify on causation, the opinion testimony of the

12   medical expert may not be stated in general terms but must be stated in terms of a

13   'reasonable degree of medical certainty.'  Only if the opinion evidence on causation, as

14   offered by the plaintiff, rises to the level of a 'reasonable degree of medical certainty' that

15   it was more likely that the defendant's negligence was the cause than any other cause, is

16   there sufficient evidence on causation to permit jury submission of causation. . . .  [T]he

17   expert has to testify, not that the condition of claimant might have, or even probably did,

18   come from the accident, but that in his professional opinion the result in question came

19   from the cause alleged.  A less direct expression of opinion falls below the required

20   standard of proof and does not constitute legally competent evidence . . . .") (citations and

21   internal quotation marks omitted).  If this were the rule in Arizona, it is difficult to see how

22   Plaintiffs' causation evidence would be sufficient to survive summary judgment.[15]

23   _____

[15]    Although Arizona courts require expert testimony on causation in certain categories
24   of lawsuits, *see, e.g., Barrett v. Harris*, 86 P.3d 954, 958 (Ariz. Ct. App. 2004)
     ("Ordinarily, a plaintiff in a *medical malpractice* lawsuit must prove the causal connection
25   between an act or omission and the ultimate injury through expert medical testimony,
     unless the connection is readily apparent to the trier of fact.") (emphasis added), Hillstone
26   has not identified any authority suggesting that expert testimony of causation is required in
     a dram-shop action under A.R.S. § 4-311 or a common-law negligence action.
27   Furthermore, Arizona courts have stated that, in general, "[p]roximate cause may be
     determined from circumstantial evidence."  *Mason v. Ariz. Pub. Serv. Co.*, 622 P.2d 493,
28   500 (Ariz. Ct. App. 1980).  *See also Salica v. Tucson Heart Hosp.-Carondelet, L.L.C.*, 231
     P.3d 946, 951 (Ariz. Ct. App. 2010) ("A party may prove proximate causation by
     presenting facts from which a causal relationship may be inferred, but the party cannot

1    Unfortunately, due in part to the manner in which the summary judgment briefing

2 unfolded—where Hillstone ignored Dr. Donelson's opinion and provided no discussion of

3 it—the Court is not convinced, at least at this stage of the proceedings, that Arizona follows

4 such a rule.  In response to Hillstone's discussion of the "mere possibility" standard during

5 oral argument, the Court conducted additional research concerning the evidentiary weight

6 Arizona courts assign to expert opinions that are qualified in the same manner as Dr.

7 Donelson's opinions here.   That research suggests that Dr. Donelson's opinion that

8 Nyerges's alcohol consumption "likely" was a "possible" factor in his choking could, when

9 coupled with the other circumstantial evidence proffered by Plaintiffs (*i.e.*, the observation

10 of unusual chewing patterns just before Nyerges choked), support a jury verdict in

11 Plaintiffs' favor on the issue of proximate causation, even though Dr. Donelson refused to

12 express that opinion with a reasonable degree of scientific certainty.

13    For example, in *Saide v. Stanton*, 659 P.2d 35 (Ariz. 1983), the Arizona Supreme

14 Court rejected a sufficiency-of-the-evidence challenge to an award of future dental

15 expenses, even though the plaintiff's expert "would not state positively" that future

16 procedures would be required, because "[t]he use or refusal of an expert to use a 'magic

17 word' or phrase such as 'probability' is not determinative" and "it is well within the

18 province of the jury to reach their own conclusion on the issue as long as the evidence as a

19 whole will support a finding that the future treatments are reasonably probable." *Id.* at 37-

20 38.  Similarly, in *Butler v. Wong*, 573 P.2d 86 (Ariz. Ct. App. 1977), in which the plaintiff

21 alleged that he developed deafness as the result of a car accident, the trial court excluded

22 the plaintiff's expert because he "never testified to a reasonable medical probability that

23 the hearing loss is connected with the accident." *Id.* at 88.  The Arizona Court of Appeals

24 reversed, holding that "[a]lthough the testimony is not forceful and clear-cut, it nevertheless

25 _____

26 leave causation to the jury's speculation.").  Thus, the Court assumes for purposes of this
order that it would have been possible for Plaintiffs to prove causation even if they hadn't
27 proffered an expert's opinion on that topic.  With that said, the Court is skeptical that the
sole piece of circumstantial evidence proffered by Plaintiffs during oral argument—a
28 witness's observation that Nyerges was taking "unusual big bites" just before he choked—
would, standing alone, be sufficient to create a jury issue on causation.  It is only when this
evidence is coupled with Dr. Donelson's proffered testimony that a jury issue arises.

aids in [plaintiff's] attempt to connect the deafness to the accident" and that "[t]he doctor's testimony, coupled with the evidence that prior to the accident the plaintiff's hearing was good, is sufficient to allow the testimony to be submitted to the trier of fact." *Id.* at 90. Given these precedents, coupled with Hillstone's failure to address these issues in its summary judgment briefing, the Court is not convinced that Hillstone has established an entitlement to summary judgment on the issue of proximate causation. *Cf. Winter v. Honeggers' & Co., Inc.*, 215 N.W.2d 316, 323 (Iowa 1974) (holding that although "expert testimony indicating that it is possible a given factual circumstance was the cause of plaintiff's injury or 'could have caused it' is insufficient, *standing alone*, to generate a fact question," "when testimony of an expert witness that a described condition is merely 'possible' or 'might' exist as a consequence of a stated cause is coupled with other testimony, nonexpert in nature, that the described condition of which complaint is made did not exist before occurrence of those facts alleged to be the cause thereof, a fact question as to causal relation is generated") (emphasis added).

All of the foregoing analysis, of course, assumes that Plaintiffs will be able to proffer Dr. Donelson's opinions as part of their case-in-chief. This is not a foregone conclusion. Courts have questioned whether it is permissible for one party to call the other side's expert during its case-in-chief. *See, e.g.*, *Holderbaum v. Carnival Corp.*, 2015 WL 4945736, *3-4 (S.D. Fla. 2015) ("[I]f Holderbaum were permitted to call Defendant's expert in her case-in-chief, she would generate juror confusion about which expert is testifying for which party. [Another] court referred to this potential prejudice as 'explosive' when the jury learns that the expert called by one party had originally been hired by an opposing party."); *Ferguson v. Michael Foods, Inc.*, 189 F.R.D. 408, 409 (D. Minn. 1999) (granting motion *in limine* to prohibit "plaintiff's plan to call defendants' medical expert . . . as an adverse witness during her case in chief," in part because "[t]o allow plaintiff to use Dr. Farnsworth in these circumstances would . . . perversely reward the plaintiff for not timely designating its own expert"). Nevertheless, there is precedent suggesting this tactic isn't categorically prohibited. *See, e.g., SEC v. Koenig*, 557 F.3d 736, 743-44 (7th Cir. 2009) (affirming in

relevant part where the defendant retained an accounting expert, the expert's opinions were favorable to the plaintiff, and the plaintiff called the expert in its case-in-chief: "A witness identified as a testimonial expert is available to either side."); *Peterson v. Willie*, 81 F.3d 1033, 1037-38 (11th Cir. 1996) ("Once a witness has been designated as expected to testify at trial, there may be situations when the witness should be permitted to testify for the opposing party."); *Meier v. UHS of Del., Inc.*, 2020 WL 923952, *12 n.7 (E.D. Tex. 2020) ("[E]ither party may still call the other side's expert witnesses at trial."); *Kerns v. Pro-Foam of S. Ala., Inc.*, 572 F. Supp. 2d 1303, 1309 (S.D. Ala. 2007) ("Neither the parties' briefs nor the Court's own research reveals any *per se* rule forbidding a party from calling an adversary's expert during his case-in-chief.").  This is an interesting issue that may profit from further briefing at future stages of the case—the Court expresses no opinion as to whether Plaintiffs will ultimately be allowed to call Dr. Donelson as a witness during their case-in-chief (and also expresses no opinion as to whether Plaintiffs will be able to survive a motion for directed verdict without Dr. Donelson's testimony).  For present purposes, the simple answer is that, because Hillstone's summary judgment briefing didn't challenge Plaintiffs' reliance on the opinions of Dr. Donelson, those opinions are properly before the Court for summary judgment purposes.

Another causation-related difficulty in this case arises from the fact that Nyerges was already heavily intoxicated at the time he arrived at Hillstone—as noted, Plaintiffs' expert Dr. Flaxmayer opines that Nyerges's BAC was .360 upon arrival.  Although the parties did not brief this issue in their summary judgment papers, it appears that, to meet their burden of proof on proximate causation, Plaintiffs will need to show that the additional 2-3 drinks Nyerges allegedly consumed after his arrival were the but-for cause of his choking death.  *Cf. Ontiveros*, 667 P.2d at 205 n.2 ("Suppose, for instance, that Flores had consumed 30 beers at Borak's and 'one more for the road' at the bar across the street. Without specific evidence it would be difficult to argue that the accident would not have happened 'but for' the last drink.").  Although it presents yet another close call, the Court concludes that Plaintiffs' proffered evidence is sufficient to preclude summary judgment

on this issue—if the jury credited Dr. Donelson's opinion that the consumption of alcohol, in general, increases the risk of choking and likely played a possible role in Nyerges's choking, the jury could also reasonably conclude that Nyerges's consumption of an additional 2-3 drinks while at Hillstone contributed "only a little" to his choking, even if the additional 2-3 drinks were "not be a 'large' or 'abundant' cause" of the choking. *Robertson,* 789 P.2d at 1047.

To the extent Hillstone's argument is that the choking incident was an intervening cause that breaks the chain of causation, the Court disagrees—whether Hillstone's alcohol service proximately caused Nyerges to choke is for the jury, because reasonable minds could differ on this question. *Torres*, 476 P.3d at 332 ("Generally, whether . . . an intervening and superseding cause[] exists is a question of fact for the jury."). *See also* Dan B. Dobbs, et al., *Dobbs' Law of Torts* § 424 (2d ed. 2011) ("But the scope of liability issue [in dram-shop cases], as in other negligence cases, is for the jury where reasonable people could differ. And Dram Shop statutes may be construed to permit liability so long as factual cause and direct injury from intoxication are proven."). Indeed, Dr. Donelson acknowledged that "health and safety agencies and organizations have long drawn a connection between alcohol as a possible factor and the risk of choking." (Doc. 112-2 at 26.)

Further, Arizona courts have held that where the victim's or a third party's conduct contributed to the injury, the defendant could still be liable as a matter of law, rendering summary judgment or dismissal improper. In *McMurtry,* the decedent drank at the bar of a hotel where she was also staying. 293 P.3d at 523-24. After she became intoxicated, a hotel bartender saw that she was intoxicated, refused her further service, and requested another hotel employee to escort her to her room. *Id.* at 524. Not long after she arrived back in her room, she climbed out of her third-floor window (apparently in an effort to step onto the balcony to smoke) and fell to her death. *Id.* at 523-24. The trial court granted summary judgment on the plaintiff's dram-shop claim, reasoning that the decedent's "decision to climb out of her window was 'unforeseeable and extraordinary,'" but the

Arizona Court of Appeals reversed, holding that because of "the hotel's window/balcony configuration" and other facts including the hotel's signage, "[o]n this record, material issues of fact exist as to whether the Hotel should have foreseen that any guest, much less a guest who is obviously intoxicated, might attempt to access the balcony via the relatively large window in Room 59." *Id.* at 532-34.  Similarly, in *Petolicchio,* a minor pilfered alcohol from his employer's inventory and furnished it to a friend who was driving a car that subsequently crashed, killing the decedent. 866 P.2d at 1344.  The court held, among other things, that the trial court erred in dismissing the negligence claim on proximate causation grounds, reasoning that "with or without the benefit of hindsight, [we cannot] say that an alcohol-related accident would be so extraordinary that a reasonable person would not anticipate this danger. . . .  [I]f Defendants had reason to know that minors might pilfer their alcohol, we cannot say, as a matter of law, that the subsequent chain of events was so unforeseeable, abnormal, and extraordinary that it constitutes a superseding cause, breaking the chain of causation." *Id.* at 1348-50.  The Court concluded: "*if* evidence of those facts is adduced at trial, Plaintiffs would make a prima facie case for the jury." *Id.* at 1350.

This case is also unlike *Patterson v. Thunder Pass, Inc.*, 153 P.3d 1064 (Ariz. Ct. App. 2007), which Hillstone cites, as well as other cases where summary judgment was proper because an intervening cause rendered the plaintiff's injury unforeseeable.  In *Patterson*, the intoxicated patron was driven safely home by a sober tavern employee but, unbeknownst to anyone, returned to the tavern later that evening, retrieved her car, and injured a third party in a head-on collision. *Id.* at 1069.  The facts of *Patterson* constitute a classic intervening cause—the patron made an independent and unpredictable decision to return to her vehicle and drive it even after she had been safely transported home. *See also Torres*, 476 P.3d at 329-36 (nightclub entitled to directed verdict on proximate causation where an intoxicated driver had "safely reached his residence, gone to bed, and fallen asleep, with no known compelling reason to leave," but later woke up, drove intoxicated, and caused an accident because this chain of events "cannot reasonably be said

to fall within the risk created" by the nightclub's act of serving him too much alcohol, but [h]ad the accident occurred as [the intoxicated driver] was driving himself home from [the nightclub], our conclusion would almost certainly be different"); *Dupray*, 432 P.3d at 939-45 (trial court erred by failing to give jury instruction on intervening and superseding cause where an intoxicated patron chose to drive himself after already being safely driven from a nightclub to a friend's house and then his girlfriend's house).  Here, by contrast, there is a rather straight line between serving Nyerges drinks, serving him food, and the choking incident.  No comparative intervening act stands out in this chain of events.  For purposes of summary judgment, then, the Court concludes that choking on food served at the same restaurant where an obviously intoxicated patron had also been drinking does not amount to an "intervening cause" that "was unforeseeable by a reasonable person in the position of the original actor" that, "when, looking backward . . . appears extraordinary."  *Torres*, 476 P.3d at 332 (internal quotation marks omitted).  Nor is there such a large number of other contributing factors in Nyerges's choking incident, or such a lapse of time between Hillstone's service of alcohol and when Nyerges choked, to preclude a jury's finding that Hillstone's conduct was a substantial factor in bringing about his death.  *Barrett v. Harris*, 86 P.3d 954, 962 (Ariz. Ct. App. 2004); Restatement (Second) of Torts § 433 (Am. L. Inst. 1965).

The two New York Appellate Division cases cited by Hillstone weigh, if at all, against granting summary judgment.  In *O'Leary v. American Airlines*, 100 A.D.2d 959 (N.Y. App. Div. 1984), the court reversed the trial court's dismissal of a complaint seeking damages for wrongful death where an intoxicated airline passenger was served food and drink and subsequently choked to death, reasoning that the airline was a common carrier that owed the decedent a duty of care and the plaintiff's amended complaint sufficiently alleged the presence of duty and breach thereof.  *Id.* at 959-61.[16]  Later, in *Filiberto v.*

---

[16]     The language Hillstone cites from *O'Leary* appears in Judge Weinstein's dissenting opinion.  100 A.D.2d at 961-62 ("The mere act of serving food and beverages to a person could not reasonably be foreseen as causing that person to choke.  Defendant's conduct vis-a-vis plaintiff's decedent was thus not patently unreasonable.  On the contrary, serving food to an inebriated person, assuming, *arguendo*, that the airline actually knew of decedent's state, is commonly perceived as a means of attempting to ameliorate that

*Herk's Tavern*, 259 A.D.2d 917 (N.Y. App. Div. 1999), the court declined to impose a common-law duty on "a food-service establishment that does not serve alcoholic beverages[] to refuse to serve food to a patron who appears to be in an intoxicated condition." *Id.* at 918.  As this language suggests, the defendant in *Filiberto* was a diner that served the decedent food, but no alcohol, while he was intoxicated as a result of drinking somewhere else.  *Id.*  In reaching this conclusion, the court expressly distinguished *O'Leary*, reasoning that "[a]lthough that case involved an inebriated person who choked while eating, the defendant airline was a common carrier and not only served food but alcoholic beverages to its passenger." *Id.* at 919.  Thus, if anything, *Filiberto* and *O'Leary* suggest that choking may be a foreseeable consequence of drinking where the defendant serves both alcohol and food to the decedent.

Finally, the two Arizona Court of Appeals decisions that Hillstone invoked during oral argument, *Graffiti-Valenzuela* and *Badia v. City of Casa Grande*, 988 P.2d 134 (Ariz. Ct. App. 1999), also do not compel a grant of summary judgment in Hillstone's favor on the issue of proximate causation.  In *Grafitti-Valenzuela*, an 11-year-old girl was waiting at a city bus stop when she was abducted by a male attacker who then held her hostage and repeatedly sexually assaulted her.  167 P.3d at 713.  One theory of liability in the ensuing lawsuit against the city was that the city's "failure to install a light and shelter at the Bus Stop proximately caused her abduction because the absence of these security measures made the Bus Stop unsafe for riders, including [the plaintiff]." *Id.* at 713-14, 717.  The trial court granted summary judgment in the city's favor, concluding among other things that the plaintiff's "abduction and sexual assault were unforeseeable as a matter of law." *Id.* at 714.  On appeal, the court affirmed, but instead of reaching whether the attacker's criminal acts constituted a superseding cause, the court concluded "as a matter of law that the City's conduct was not a cause-in-fact of [the plaintiff's] injuries." *Id.* at 719.

The *Grafitti-Valenzuela* court's conclusion and the reasoning on which it was based are distinguishable from this case in at least two important respects.  First, the court's

---

condition.").

reasoning was informed by case law addressing "the evidence necessary to establish a reasonable causal connection in a case involving the criminal acts of a third party." *Id.* at 717-18.   Here, obviously, Plaintiffs' claims do not involve third-party criminal acts. Second, the evidence in *Grafitti-Valenzuela* overwhelmingly showed that the bus stop's lack of a shelter and low lighting did not cause the plaintiff's injuries because: (1) the attacker spoke to the plaintiff before he approached her, "causing her to turn toward him and observe him at the Bus Stop before he assailed her" and she "then turned away from him, giving him the opportunity to approach her from behind," so it was not the case "that he was able to surprise her from behind because of the lack of a protective shelter;" (2) the attacker was not deterred by three teenagers who were nearby and witnessed the abduction; and (3) the attacker "subsequently attacked another victim in brighter light than existed at the Bus Stop." *Id.* at 718-19.   In the face of this evidence, the court found that the plaintiff's experts' opinions on causation amounted to "nothing more than speculation" in light of the "undisputed material facts" demonstrating that the absence of lighting and a shelter did not play a role in the injuries.  *Id.*  It makes sense that the *Grafitti-Valenzuela* court did not think it proper to ask a jury to speculate whether a repeat criminal offender might have been deterred from a crime if the setting of the crime were constructed differently.  But in this case, the jury will be tasked with the more straightforward question of whether serving an obviously intoxicated patron two to three drinks was a substantial factor in his death by choking.

Similarly, in *Badia*, the decedent was arrested for driving while intoxicated, booked at the police station, and released.  988 P.2d at 135-16.  She asked for her friend, and not her boyfriend, to pick her up from the police station, but the friend and boyfriend jointly picked her up.  *Id.* at 136.  The decedent and the boyfriend argued and shoved each other while they were still at the police station.  *Id.*  The friend then drove the decedent and the boyfriend to a convenience store because the decedent wanted to buy more beer.  *Id.*  The decedent and boyfriend resumed drinking, and, ultimately, within about two hours after her release from police custody, the decedent was stabbed to death by her boyfriend.  *Id.*  One

1  theory of liability in the ensuing negligence action was that the defendants had failed to

2  take reasonable precautions for the decedent's safety by releasing her to her murderous

3  boyfriend "and had thereby proximately caused her death." *Id.* at 137.  The trial court

4  granted summary judgment in the defendants' favor and the Arizona Court of Appeals

5  affirmed, holding that a trier of fact could not "reasonably infer[] that [the decedent's]

6  sobriety level or defendants' other alleged violations of police custom and practice

7  proximately caused Murrillo to attack Perez, which resulted in her death." *Id.  Badia* is,

8  like *Graffiti-Valenzuela*, distinguishable from this case, which does not involve third-party

9  criminal acts but a relatively straightforward sequence of events from which a jury could

10  conclude that Hillstone's conduct was a substantial factor in Nyerges's choking.

11       In summary, causation is a very close call on this record.  In reaching the conclusion

12  that Hillstone is not entitled to summary judgment, the Court reiterates that it must construe

13  the evidence in the light most favorable to Plaintiffs and draw all reasonable inferences in

14  their favor.  The Court is also mindful that under Arizona law causation is generally a fact

15  question reserved for the jury unless "the plaintiff's evidence fails to establish a non-

16  speculative causal connection or when reasonable persons could not differ."  *Torres*, 476

17  P.3d at 331.

18            2.    Negligence

19                 a.    **Applicable Arizona Law**

20       The Arizona Supreme Court has established that "those who furnish liquor have an

21  obligation or 'duty' to exercise care for the protection of others," which includes the duty

22  to exercise reasonable care "in furnishing liquor to those who, by reason of . . . previous

23  over-indulgence, may lack full capacity of self-control and may therefore injure

24  themselves, as well as others."  *Ontiveros*, 667 P.2d at 211; *Brannigan*, 667 P.2d at 216.

25       Thus, alongside dram-shop liability under § 4-311, Arizona law provides a

26  common-law negligence cause of action against a tavern that overserves a patron.  *See,*

27  *e.g.*, *Henning v. Montecini Hosp., Inc.*, 172 P.3d 430, 432 (Ariz. Ct. App. 2007) ("Arizona

28  imposes a duty of care, both by statute and common law, on a supplier of liquor to refrain

from serving alcoholic beverages to underage persons or those who are disorderly or obviously intoxicated.") (internal quotation marks omitted).  This common-law liability is premised, in part, on the criminal statute discussed above, which makes it a misdemeanor offense "to serve, sell or furnish spiritous liquor to a disorderly or obviously intoxicated person" or "to allow or permit a disorderly or obviously intoxicated person to come into or remain on or about the premises," except for a maximum of 30 minutes "for a nonintoxicated person to transport the obviously intoxicated person from the premises." A.R.S. § 4-244(14).  *See also Ontiveros*, 667 P.2d at 209 ("Even if the existence of a tavern owner's duty to act with care when furnishing liquor to patrons could not be found by application of common law principle and authority, its existence could be postulated upon the affirmative requirements of [§ 4-244(14)].")

To maintain a negligence action, a plaintiff must prove "(1) a legal duty or obligation requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks; (2) failure on the defendant's part to conform to the standard required; (3) a reasonably close causal connection between the conduct and the resulting injury; and (4) actual loss or damage."  *Patterson*, 153 P.3d at 1066.  "The first element, whether a duty exists, is a question of law for the court to decide." *Id.*  "The other elements are generally factual issues decided by a jury," but "summary judgment may be appropriate if no reasonable juror could conclude that the standard of care was breached or that the damages were proximately caused by the defendant's conduct."  *Id.* at 1067.

### b.   **The Parties' Arguments**

Hillstone does not argue it is entitled to summary judgment on Plaintiffs' common-law negligence claim with respect to duty or damages.  Instead, as with its arguments regarding Plaintiffs' claim under § 4-311, Hillstone asserts that a reasonable juror could not conclude that Nyerges was obviously intoxicated or that Hillstone's service of alcohol caused his death.  (Doc. 96 at 14.)

Plaintiffs also premise their negligence claim on one alternative theory of liability—

that Hillstone breached its duty of care by failing to provide employees "with appropriate training and instruction on reasonable spiritous liquor service to patrons as well as requiring employees to follow that training and instruction." (Doc. 1 ¶¶ 32-33.) Hillstone argues this allegation fails because "any argument about training is irrelevant because Plaintiffs cannot establish that Bandera negligently served Mr. Nyerges" and further argues that, "even if negligent service could be shown," there is no evidence that Hillstone breached the standard of care in training or that such breach caused Nyerges's death. (Doc. 96 at 15.)

Plaintiffs respond that evidence in the record suggests that Bandera's wait staff violated Bandera's policies and procedures by not immediately cutting Nyerges off and by not notifying Bandera managers of Nyerges's intoxication. (Doc. 112 at 14-15; Doc. 112-4 at 10.) Plaintiffs also argue that § 4-244(14) establishes that a tavern breaches its duty of care when serving someone who is either "disorderly or obviously intoxicated" and that Nyerges's behavior was disorderly, so Hillstone breached its duty of care by not removing him from the premises or seeking safe transportation for him. (Doc. 112 at 15-16.)

Hillstone replies that the "only substantive difference" between Plaintiffs' two claims is that the common-law claim alleges negligent training. (Doc. 115 at 8.) Hillstone argues this claim fails not only because Plaintiffs cannot demonstrate that Hillstone negligently served Nyerges, but also because there is insufficient evidence for a reasonable juror to conclude that Hillstone breached the standard of care in employee training or that any training failures caused Nyerges's death. (*Id.* at 8-9.)

### c.   **Obvious Intoxication And Causation**

Both sides argue that the obvious intoxication and causation analyses are the same for the § 4-311 and common-law negligence claims. (Doc. 96 at 13 [Hillstone, arguing that "the analysis on the common-law claim is functionally the same at the analysis on the statutory claim"]; Doc. 112 at 16 [Plaintiffs, discussing "Arizona's statutory and/or negligence laws" interchangeably when discussing causation].)

The Court does not necessarily agree. Although, as discussed above, Plaintiffs may

1    not rely on Hillstone's alleged breach of the "30 minute rule" set forth in § 4-244(14) as

2    the foundation for their statutory dramshop claim under § 4-311, there is some Arizona

3    authority suggesting they may rely on alleged violations of § 4-244 as providing the

4    foundation for their common-law negligence claim. *See, e.g., Carrillo v. El Mirage*

5    *Roadhouse, Inc.*, 793 P.2d 121, 126 (Ariz. Ct. App. 1990) ("A.R.S. § 4-244(14) . . . sets

6    the standard of care."); *Ontiveros*, 667 P.2d at 209-11 (rejecting defendant's argument that

7    A.R.S. §§ 4-244(14) and -246 were "not enacted as safety measures but merely as

8    regulatory measures affecting the liquor industry" and thus holding that "the existence of

9    a tavern owner's duty to act with care when furnishing liquor to patrons . . . could be

10   postulated upon the affirmative requirements of statute"); *Patterson,* 153 P.3d at 1067 ("In

11   *Ontiveros*, the court . . . concluded that tavern owner liability could be premised on

12   statutory authority, specifically A.R.S. § 4–244(14)."). *But see McMurtry*, 293 P.3d at 534

13   n.10 (explaining that "we are not convinced that A.R.S. § 4–244(14) was intended to affect

14   civil liability" and "disagree[ing] with Patterson to the extent" it reaches the opposite

15   conclusion).

16        At any rate, because the Court has already determined that Hillstone is not entitled

17   to summary judgment on the issues of obvious intoxication and causation with respect to

18   Plaintiffs' claim under § 4-311, it is unnecessary to decide whether Plaintiffs' invocation

19   of the "30 minute rule" established by § 4-244(14) provides an additional pathway to

20   liability and causation for purposes of their common-law negligence claim.  That is an issue

21   to be decided, if necessary, at a later stage of this case.[17]  Similarly, although Plaintiffs

22   suggest in their response that the language of § 4-244(14) means a tavern may breach its

23   duty if it fails to expel a "disorderly" customer—that is, not only an "obviously intoxicated"

24   customer as listed in § 4-311—the Court need not reach that issue now.

25   _____

26   [17]      For further analysis on the interplay between a common-law negligence claim and
     one brought under § 4-311, see *Andrews ex rel. Woodard v. Eddie's Place, Inc.*, 16 P.3d
27   801, 803 (Ariz. Ct. App. 2000) (concluding that § 4-311 did not "annul or abrogate" a
     common-law action brought under *Ontiveros*, but that § 4-311 "simply attempted to codify
28   the common law established by *Ontiveros*" and that a two-year statute of limitations
     applied to a common-law dram-shop claim under § 12-542(1) rather than the one-year
     § 12-541(5) statute of limitations that applies to statutory causes of action).

- 55 -

d.     **Negligent Training**

"To prevail on a negligent training claim, a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries." *Guerra v. State*, 323 P.3d 765, 772 (Ariz. Ct. App. 2014), *vacated on other grounds*, 348 P.3d 423 (Ariz. 2015).

Hillstone is entitled to summary judgment on Plaintiffs' negligent training allegations.  Plaintiffs' only proffered pieces of evidence on the training issue are the testimony of Hillstone's Rule 30(b)(6) witness and a paper explaining Hillstone's "Alcohol Awareness Program." (Doc. 112-2 at 22-23; Doc. 112-4 at 10.)  These materials, however, affirmatively show that Hillstone had an alcohol service program intended to prohibit "serv[ing] alcohol to an intoxicated person" (Doc. 112-4 at 10) and trained its employees to follow it.  At most, Plaintiffs have shown that the employees who interacted with Nyerges failed to comply with that training.  This is not evidence that the training efforts themselves were inadequate or insufficient.  *Guerra*, 323 P.3d at 772-73 ("A showing of an employee's incompetence is not necessarily enough; the plaintiff must also present evidence showing what training should have been provided."). *Cf. Alcala v. Marriott Int'l, Inc.*, 880 N.W. 2d 699, 709 (Iowa 2016) ("Alcala argues the jury can find Marriott breached a duty to train DePaepe by connecting these dots: there was ice on the sidewalk; therefore, DePaepe did not apply deicer properly; therefore, Marriott did not train her properly.  If that is sufficient, then going forward, employers could be sued for negligent training whenever there is an avoidable accident.  We conclude that the evidence in this case was insufficient to support a negligent-training instruction or specification of negligence."). Nor have Plaintiffs proffered any evidence about how the extent or quality of the training (or lack thereof) caused Nyerges's death.  Summary judgment is therefore proper with respect to this issue.

3.     Claim Of Warren Nyerges

Hillstone also moves for partial summary judgment against Warren Nyerges, who sues as the representative of Nyerges's estate (the "Estate"). (Doc. 96 at 15-16.)  Hillstone

1   argues that in this wrongful death action, Nyerges's mother Helen Nyerges, as the surviving

2   parent, is the only proper plaintiff under A.R.S. § 12-612(A).  (*Id.* at 16.)

3          Plaintiffs respond that, separate and apart from Helen Nyerges's wrongful death

4   claim, the Estate (via Warren Nyerges) has asserted a claim under A.R.S. § 14-3110, which

5   allows for a survival action brought by a decedent's estate.  (Doc. 112 at 16-17.)  Plaintiffs

6   acknowledge that the complaint "was not perfectly clear on the issue" but identify various

7   reasons why the Estate's survival claim should be recognized.  (*Id.*)

8          In reply, Hillstone argues that "Plaintiffs failed to plead a cause of action for a

9   survival claim pursuant A.R.S. § 14-3110."  (Doc. 115 at 11.)

10          The parties elaborate on these arguments in their briefing on Hillstone's motion to

11   exclude the testimony of Plaintiffs' economic experts, Larry D. Stokes and Michael J.

12   Stokes.  (Docs. 94, 105, 110.)  Issues specific to that motion are taken up in an

13   accompanying order, but in brief, Hillstone argues that the Stokeses' testimony, which

14   estimates the present value of Nyerges's loss of earnings and income, should be excluded

15   because such testimony is irrelevant to a wrongful death claim under A.R.S. § 12-613.

16   (Doc. 94.)  Plaintiffs respond that the evidence is relevant to the survival action brought

17   under § 14-3110 because the Estate, unlike the wrongful death beneficiary, *is* entitled to

18   recover loss of future income.  (Doc. 105 at 1.)  Plaintiffs argue that Hillstone had notice

19   of the § 14-3110 claim under Arizona's notice pleading standards or under the standards

20   set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  (*Id.* at 3.)  Plaintiffs further

21   argue Hillstone had sufficient notice because (1) the complaint states that Plaintiffs' claims

22   are brought both on behalf of Helen Nyerges as the § 12-612 beneficiary and Warren

23   Nyerges as the Estate's representative (even if the complaint does not reference § 14-3110

24   explicitly); and (2) Plaintiffs' MIDP disclosures dated June 20, 2019 state clearly that the

25   Estate brings a claim "pursuant to A.R.S. 14-3110."  (*Id.  See also* Doc. 1 at 21-22

26   [amended complaint]; Doc. 105-1 at 8 [MIDP disclosure].)  In reply, Hillstone concedes

27   that it is, in general, permissible to assert wrongful death and survival claims in the same

28   action but argues that Plaintiffs failed to plead such claims here.  (Doc. 110 at 2-3.)

1    Hillstone adds that in a previous action,[18] Plaintiffs' counsel did state both wrongful death

2    and § 14-3110 claims in the same complaint, so "[i]f Plaintiffs wanted to plead [a survival

3    claim], they could have (because clearly counsel knows how to assert a survival claim) but

4    Plaintiffs chose not to do so."  (*Id.* at 3.)

5            Hillstone's arguments lack merit.  The Federal Rules of Civil Procedure apply to an

6    action after it is removed from a state court, as happened here.  Fed. R. Civ. P. 81(c)(1).

7    *See also* 1 Gensler, *supra*, Rule 8, at 176 ("[S]tate pleading rules, be they more or less

8    lenient, do not apply in federal court.").  Accordingly, Federal Rule of Civil Procedure 8's

9    pleading standards apply to Plaintiffs' complaint.

10           Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim

11   showing that the pleader is entitled to relief."  Critically, this rule "do[es] not countenance

12   dismissal of a complaint for imperfect statement of the legal theory supporting the claim

13   asserted."  *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).  The Supreme Court's

14   *Twombly* and *Iqbal* holdings "are not in point, for they concern the *factual* allegations a

15   complaint must contain to survive a motion to dismiss."  *Id.  See also id.* ("The federal

16   rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that

17   it is unnecessary to set out a legal theory for the plaintiff's claim for relief.") (internal

18   quotation marks omitted).

19           As a result, the Estate's survival claim under § 14-3110 does not fail due to

20   Plaintiffs' failure to explicitly cite that statute or articulate it as a standalone legal theory

21   in the complaint.  The amended complaint clearly identifies the Estate as one of the

22   Plaintiffs and Warren Nyerges as the Estate's representative.  Such allegations were

23   sufficient to put Hillstone on notice that the Estate, and not merely the wrongful death

24   beneficiary, was seeking relief.  (Doc. 1 at 21-22.)

25           The Court's analysis is guided in part by Rule 8(e)'s mandate that pleadings "be

26   _____

27   [18]      That action was *Manion v. Ameri-Can Freight Sys., Inc.*, 391 F. Supp. 3d 888 (D.
     Ariz. 2019).  There, the Court noted that "Arizona courts have explained that '[a] wrongful
28   death action is an original and distinct claim for damages sustained by the statutory
     beneficiaries and is not derivative of or a continuation of a claim existing in the decedent.'"
     *Id.* at 892 (alteration in original) (citation omitted).

construed so as to do justice."  Rule 8(e) "stands as a reminder that, when enforcing the pleadings requirements, courts must not exalt form over substance or rely on errors in draftsmanship to bar justice."  1 Gensler, *supra*, at 169 (internal quotation marks omitted). Thus, even if Plaintiffs' counsel has on other occasions more clearly articulated the intent to assert a survival claim, counsel's drafting approach in this instance is not a basis to dismiss the Estate.

Accordingly, **IT IS ORDERED** that:

1.  Plaintiffs' motion for sanctions (Doc. 89) is **granted in part and denied in part**, as outlined above.

2.  Hillstone's motion for summary judgment (Doc. 96) is **granted in part and denied in part**, as outlined above.

Dated this 2nd day of August, 2021.

_____
Dominic W. Lanza
United States District Judge