**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Helen Nyerges, et al., | No. CV-19-02376-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Hillstone Restaurant Group Incorporated, | |
| Defendant. | |

Pending before the Court are Defendant Hillstone Restaurant Group Inc.'s ("Hillstone") motions to exclude expert opinions.  (Docs. 92-94.)  For the following reasons, the motion to exclude the testimony of Chester Flaxmayer (Doc. 93) is granted in part and denied in part, the motion to exclude the testimony of M. Randy Durnal (Doc. 92) is granted, and the motion to exclude the testimony of Larry D. Stokes and Michael J. Stokes (Doc. 94) is denied.

## BACKGROUND

This is a dram-shop liability action arising out of the death of Lewis Nyerges ("Nyerges").  On the evening in question, Nyerges and a group of companions consumed food and drinks at Bandera, a Scottsdale restaurant operated by Hillstone.  Around 10:00 p.m., Nyerges choked while eating his meal, collapsed, and was rushed to the hospital, where he later died.  Although Nyerges's formal cause of death was asphyxiation due to choking on a piece of meat, his blood alcohol concentration ("BAC") was measured at .422 at the hospital.   Helen Nyerges, the wrongful death statutory beneficiary, and Warren

Nyerges, Nyerges's estate's representative (collectively, "Plaintiffs"), now sue Hillstone for violating Arizona's dram-shop statute and for negligence.

**DISCUSSION**

I.    Legal Standard

"The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

As for the threshold requirement that an expert witness be qualified "by knowledge, skill, experience, training, or education," "Rule 702 'contemplates a broad conception of expert qualifications.'" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (citation and emphasis omitted). Years of relevant experience can establish the necessary "minimal foundation." *Id.* at 1015-16 (finding that twenty-five years of working as an independent consultant and an expert witness in the insurance industry satisfied the "minimal foundation" necessary to provide expert testimony). "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).

A district court's decision to admit or exclude expert testimony is guided by a two-part test that focuses on the opinion's relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "The inquiry envisioned by Rule 702 is . . . a

flexible one." *Id.* at 594. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Evidence is relevant if it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 587 (quoting Fed. R. Evid. 401). "The Rule's basic standard of relevance thus is a liberal one." *Id.*

The basic standard of reliability is similarly broad. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (citation and internal quotation marks omitted).

Nevertheless, courts serve an important "gatekeeper" role when it comes to screening expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable

and in deciding how to test for reliability.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  In *Daubert*, the Supreme Court listed various factors that might be applicable, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community.  509 U.S. at 593-94.  However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case." *Hankey*, 203 F.3d at 1168.  In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."  *Id.* at 1169. *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others.  Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.").  The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.  The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  *See* Fed. R. Evid. 702, advisory committee note to 2000 amendments.

II.     Chester Flaxmayer

One of Plaintiffs' expert witnesses is Chester Flaxmayer ("Flaxmayer"), "a Criminalist with over thirty years of practical experience in the area of forensic breath and blood alcohol determinations and the measurement of drugs in the human system as well as their effects."  (Doc. 93-1 at 2 ¶ 1.)  When preparing his report, Flaxmayer reviewed a variety of academic papers as well as records, reports, deposition testimony, and other documentary evidence regarding Nyerges's choking incident.  (*Id.* at 5-6 ¶ 8.)  Flaxmayer concludes, based on all of this information, that Nyerges's BAC was .366 at the time he

choked (*id.* at 10 ¶ 21) and .360 at the time of his arrival at Bandera (*id.* at 11 ¶ 27.)[1]  He also opines on the impairment caused by alcohol and the likely symptoms of a person with a BAC in Nyerges's range.  (*Id.* at 12-14 ¶¶ 32-36, 38-44.)  Flaxmayer also adds that, in his opinion, "a bar or server that gives enough alcohol to a patron for that patron to have [a BAC] of 0.08 . . . upon leaving their establishment, knew, or should have known that they were creating a risk that the patron or to others from the possible actions of the patron."  (*Id.* at 13 ¶ 37.)  The Court will refer to this final portion of Flaxmayer's opinion as the "Risk Opinion."

### A.   **Parties' Arguments**

Hillstone moves to exclude Flaxmayer's "entire report and opinion."  (Doc. 93 at 5.)  Hillstone contends that Flaxmayer's opinion is inadmissible under Rule 702 because Flaxmayer never opines as "to what signs (if any) he believes Mr. Nyerges was displaying at Bandera," so "Flaxmayer's report did not apply the facts of *this* case, or any facts."  (*Id.* at 6.)  In a similar vein, Hillstone argues in the alternative that even if Flaxmayer is permitted to testify, he should be precluded from testifying either directly or by implication that Nyerges was showing obvious signs of intoxication.  (*Id.* at 5, 7.)  In essence, Hillstone argues that Flaxmayer's opinion about what symptoms a person with Nyerges's BAC would display is contradicted by eyewitness testimony, so Flaxmayer's testimony on this issue should be excluded as "not supported by the evidence in this case."  (*Id.* at 7.)  Finally, Hillstone argues that if Flaxmayer is allowed to testify, at a minimum his "Risk Opinion" should be excluded because it (1) is vague and "hollow substantively"; (2) will confuse the jury; (3) is not based on reliable principles and methods and is conclusory; and (4) is legally unsound because tavern owners do not have a duty to test patrons' BACs.  (*Id.* at 8-9.)

---

[1]   This figure is derived from the .422 ethyl alcohol reading that—it is undisputed—was reported in hospital records.  (Doc. 96-2 at 63.)  According to Flaxmayer, "[m]ost hospital labs utilize serum or plasma measurement via an enzymatic method when determining blood alcohol in a hospital setting," "a rapid method, allowing for quick determination of the BAC." (Doc. 93-1 at 10 ¶¶ 18-19.)  Flaxmayer extrapolates from this reading to calculate the BAC under the serum/blood ratio as .366.  (*Id.* at 10 ¶¶ 20-21.)  Flaxmayer reasons that Nyerges's BAC at the time of choking would have been "close to" his BAC at the hospital, because "injuries slow or stop absorption."  (*Id.* at 11 ¶ 24.)

In response, Plaintiffs concede that Flaxmayer will not testify as to his Risk Opinion and will not opine that Nyerges was obviously intoxicated.  (Doc. 104 at 3.)  Otherwise, Plaintiffs argue that Flaxmayer's challenged opinions were reached by applying reliable methods to the facts of the case and that, although Flaxmayer is not in a position to testify about the actual signs Nyerges displayed that evening, "a BAC reading at the time the test is taken may have some bearing on whether a person was impaired" and Flaxmayer's testimony is "just one piece of evidence" on Nyerges's intoxication the jury can weigh. (*Id.* at 4.)

In its reply, Hillstone argues that Flaxmayer's testimony amounts to "snippets and incomplete opinion" because it does not address how "the BAC affected Mr. Nyerges or that he displayed any signs" of intoxication.  (Doc. 109 at 2-3.)  Hillstone also argues for the first time that Flaxmayer's testimony should be excluded under Rule 403 because it will confuse the jury.  (*Id.* at 3.)

B.    **Analysis**

1.    Rule 702

Hillstone does not argue that Flaxmayer is unqualified or that his methods are unreliable.  Instead, the crux of Hillstone's argument is that Flaxmayer's testimony does not apply to the specific facts of this case and therefore will require "a jury to speculate and infer whether the BAC was in any manner connected to decedent's choking and death." (Doc. 109 at 2.)  In essence, this is an argument about relevance: because Flaxmayer testifies only generally about what Nyerges's BAC was and what kinds of effects such a BAC would have on a hypothetical person's demeanor, it won't help the jury determine whether Nyerges was, in fact, showing signs of obvious intoxication that evening.

This reasoning is without merit.  Rule 702's basic standard of relevance "is a liberal one": evidence is relevant so long as it "has *any* tendency to make the existence of *any* fact that is of consequence to the determination of the action" more or less probable.  *Daubert*, 509 U.S. at 587 (emphasis added).  Flaxmayer's opinions that Nyerges's BAC was .360 at the time of arrival and .366 at the time of choking, and that such a BAC would likely cause

a person to exhibit certain severe physical symptoms—opinions that Hillstone does not contest as unreliable or without foundation—have a tendency to make it more probable that Nyerges exhibited signs of obvious intoxication that evening.  Put differently, these opinions make it less probable that the eyewitnesses in this case, including Bandera staff, failed to observe Nyerges showing any signs of obvious intoxication.

To the extent Hillstone thinks this evidence is not probative, it can of course attack the testimony "by cross examination, contrary evidence, and attention to the burden of proof." *Primiano*, 598 F.3d at 564.  But exclusion would be improper.  *Cf. id.* at 567 (exclusion not the proper remedy where the opinion would assist the trier of fact even where there may have been grounds for impeachment).  Nor does Flaxmayer's lack of first-hand knowledge undermine the admissibility of his expert testimony.  "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592.

The Court also notes that Arizona courts have, on multiple occasions, concluded that the type of evidence Flaxmayer proffers is relevant to determining a patron's level of intoxication in dram-shop and other contexts.  *See, e.g.*, *Dupray v. JAI Dining Servs. (Phx.) Inc.*, 432 P.3d 937, 941-42 (Ariz. Ct. App. 2018) ("The Duprays presented evidence that JAI did not exercise reasonable care in serving intoxicants to Panameno. . . .  A forensic toxicologist testified that, based on an analysis of the toxicology reports of Panameno's blood after the collision, Panameno's blood alcohol concentration reached 0.10—the point at which a person would become visibly intoxicated—while he was at the club."); *Young through Young v. DFW Corp.*, 908 P.2d 1, 3 (Ariz. Ct. App. 1995) ("Three toxicologists testified that, given her weight of approximately 125 pounds and her .20 blood alcohol concentration after the accident, Jacobi had to have consumed the equivalent of nine to ten drinks in a four-hour period that evening. . . .  Thus . . . from the circumstances, including Jacobi's size and the number of drinks she had consumed, Young might have established a general negligence claim that Keegan's knew or should have known that Jacobi was legally intoxicated . . . ."); *Callender v. Transpacific Hotel Corp.*, 880 P.2d 1103, 1108-09

(Ariz. Ct. App. 1993) (discussing role of expert testimony that "based on certain assumed facts and Callender's blood test results at the hospital . . . Callender would necessarily have displayed obvious signs of intoxication when he purchased the 'bucket' of Mai Tais" in upholding jury verdict in favor of tavern owner). *See also State v. Klausner*, 978 P.2d 654, 658 (Ariz. Ct. App. 1998) ("We accept as a fact it is not possible to precisely quantify the alcohol content of a person's blood at the time the person was driving from a sample taken at a later time without evidence to relate the sample back. This does not mean, however, that there is *no* relationship between a BAC reading taken within two hours of driving and whether a person's driving was influenced to the slightest degree by alcohol. In many cases, there will be an obvious relationship. To use an extreme example, a person who has a BAC of .30 ten minutes after driving was certainly heavily under the influence when they were behind the wheel. Surely, this would be true whatever the variables that apply and regardless of whether the BAC was rising or falling at the time the test was taken.").[2]

Flaxmayer's testimony is admissible under Rule 702's relevance test.

### 2.   Rule 403

Hillstone argues that Flaxmayer's testimony should be excluded under Rule 403, which permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

---

[2]      The cases Hillstone cites do not weigh against this conclusion. In *Sorensen v. Denny Nash, Inc.*, 249 A.D.2d 745 (N.Y. App. Div. 1998), the New York Appellate Division held that a forensic pathologist's expert testimony was insufficient to defeat the defense's summary judgment motion where eyewitness testimony uniformly established that the patron was not visibly intoxicated, the expert's opinion was based on blood alcohol levels from three hours after the relevant time period, and the expert's references to supporting scientific principles were "nonspecific and vague and unaccompanied by any evidence establishing their reliability." *Id.* at 747-48. In reaching this result, the court notably did not hold that such evidence was inadmissible or would never be relevant to a dram-shop liability action, instead holding only that "proof of a high alcohol count in an individual served alcohol does not, *without more*, provide a sound basis for drawing inferences in that person's appearance or demeanor." *Id.* at 747 (emphasis added). Similarly, the Washington case Hillstone cites actually undermines its argument: "While this court has rejected BAC as evidence sufficient *by itself* to establish a triable issue of fact regarding apparent intoxication, BAC evidence is relevant as corroborative and supportive of the credibility of firsthand observations." *Faust v. Albertson*, 222 P.3d 1208, 1215 (Wash. 2009).

evidence."

The Court need not consider this argument because Hillstone raised it for the first time in its reply. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Nevertheless, the Court concludes that Flaxmayer's challenged opinions are admissible under Rule 403. Hillstone argues that Flaxmayer's testimony may confuse the jury, but Hillstone has failed to demonstrate that this risk, assuming it even exists, substantially outweighs the testimony's probative value. For the reasons noted above, Flaxmayer's testimony is relevant and may assist the jury in reaching its conclusion on the obvious-intoxication issue. Hillstone does not make clear why it believes the testimony might confuse the jury, much less how the risk of such confusion will substantially outweigh its probative value.

### C.   Conclusion

Hillstone's motion is denied insofar as it seeks to preclude Flaxmayer from testifying altogether. The motion is granted insofar as Flaxmayer will not, as Plaintiffs have confirmed, be offering his Risk Opinion or that Nyerges was in fact obviously intoxicated.

### III.   M. Randy Durnal

Plaintiffs seek to call M. Randy Durnal ("Durnal") to opine on whether the Bandera staff members' behavior on the night of Nyerges's choking breached the standard of care. (Doc. 92-1 at 4.) Durnal has "40 years of liquor experience," roughly one-third of which was in law enforcement. (*Id.*) He has experience in training, public speaking, testifying, consulting, and publishing on topics related to liquor laws and management practices, with a special focus on the standard of care. (*Id.*) Durnal's opinion is based on his review of documentary evidence, deposition testimony, other discovery materials, "Numerous Studies," and legal materials including "Title Four" and "Case Law." (*Id.* at 6.) His report provides a narrative of the events of the evening of Nyerges's choking, quotes relevant Arizona statutes and regulations pertaining to liquor service, and discusses Hillstone's "Alcohol Awareness Program." (*Id.* at 5-9.) Durnal ultimately opines that Hillstone "fell

below the standard of care" by serving Nyerges when he was obviously intoxicated "and by allowing him to stay at the restaurant for more than 30 minutes after [Bandera staff] recognized that he was obviously intoxicated." (*Id.* at 9.) Durnal also provides an opinion on causation, stating that "[h]ad Bandera followed the standard of care Mr. Nyerges would not have been in the restaurant at the time that he choked, and he never would have choked" and that excess alcohol consumption can lead to impaired judgment, "bad decisions," and that intoxicated people "at times choke on food, which was the case here." (*Id.* at 9-10.)

### A. **Parties' Arguments**

Hillstone seeks to exclude Durnal's opinions with respect to both the standard of care and causation. (Doc. 92 at 1.)

Hillstone argues the standard-of-care opinion must be excluded because Durnal's conclusion "depends on the unsupported assumption that Mr. Nyerges was 'obviously intoxicated.'" (*Id.* at 5.) Hillstone contends this assumption is unsupported because none of the eyewitnesses observed outward signs of intoxication, so no reasonable juror could conclude that Nyerges was in fact obviously intoxicated. (*Id.* at 5-10.) Hillstone further argues that the evidence Durnal cites in concluding that Nyerges was obviously intoxicated—(1) Nyerges's inability to tally his bar tab, (2) Bandera's surveillance video, (3) staff not serving Nyerges any drinks after he arrived at the dinner table, (4) a Hillstone manager's statement on a 911 call that Nyerges was intoxicated, and (5) one of Nyerges's dining companions telling police that Nyerges was heavily intoxicated—is insufficient and/or inadmissible hearsay. (*Id.* at 10-13.) As a result, Hillstone argues, Durnal "has not reliably applied the facts to his analysis on whether Bandera breached the standard of care." (*Id.* at 13-14.)

Hillstone further argues that Durnal's testimony on causation must be excluded because: (1) the testimony "fails to identify any methods and contains no analysis on any connection between intoxication and increased choking risk"; (2) the testimony "defies case law and common[]sense on reasonable foreseeability"; and (3) "Durnal's background relates to standard of care" but he is unqualified to testify on causation. (*Id.* at 14-17.)

1          Plaintiffs respond that Durnal's opinions as to the standard of care are informed by
2   his understanding of the facts of this case and that the parties' ongoing disputes about these
3   underlying facts—in particular, whether Nyerges was obviously intoxicated at relevant
4   times—go to the weight, not the admissibility, of Durnal's testimony.  (Doc. 106 at 5-6.)
5   Plaintiffs also argue that the 911 call transcript and police report are either not hearsay or
6   fall within one or more of the exceptions to the rule against hearsay.  (Doc. 106 at 6-7.)  In
7   any event, Plaintiffs argue, Durnal may rely on these materials pursuant to Rule 703 even
8   if they are inadmissible, as "Durnal will testify that experts in his field reasonably and
9   regularly rely upon police reports and the statements of witnesses contained within them."
10  (*Id.* at 7.)  As for causation, Plaintiffs assert that Durnal's conclusion "logically follows"
11  from his standard-of-care opinions, because he simply observes that if Nyerges had been
12  required to leave Bandera within 30 minutes of appearing obviously intoxicated—which,
13  in Plaintiffs' view, occurred at the time that Nyerges failed to successfully tally his bar
14  tab—he would not have been able to order and eat the food on which he choked roughly
15  45 minutes later.  (*Id.* at 3-4.)  Plaintiffs do not otherwise address Hillstone's challenges to
16  Durnal's causation opinion.

17         Hillstone's reply as to the standard-of-care opinion reasserts that "there is
18  insufficient evidence to create a question of fact for the jury on whether Mr. Nyerges was
19  'obviously intoxicated' while at Bandera, [so] Mr. Durnal should not be permitted to testify
20  to a conclusion that rests on the assumption that he was."  (Doc. 108 at 2-3.)  Hillstone also
21  argues Plaintiffs' hearsay analysis is incorrect but does not address whether Durnal may
22  rely on these statements under Rule 703.  (*Id.* at 3.)  Finally, Hillstone argues Durnal's
23  causation opinion fails for three reasons: (1) Plaintiffs failed to respond to Hillstone's
24  causation-related challenges in their response; (2) Durnal "does not have the requisite
25  experience to offer causation opinions" on the relationship between alcohol consumption
26  and choking; and (3) Durnal's straightforward opinion that if Nyerges had not been
27  permitted to remain at Bandera for dinner, he would not have choked, is "a speculative
28  concept the jury understands" and does not need an expert to tell them.  (*Id.* at 4-7.)

1    B.    **Analysis**

2        The cornerstone of Hillstone's argument is that no evidence in the record supports

3    the conclusion that Nyerges was obviously intoxicated at Bandera, so Durnal's conclusions

4    are baseless and unreliable.  As explained in the accompanying summary judgment order,

5    a reasonable jury could conclude that Nyerges was obviously intoxicated.  Because these

6    facts are reasonably in dispute, it was permissible for Durnal to base his opinions on the

7    assumption that Nyerges was, in fact, obviously intoxicated.  Fed. R. Evid. 702, advisory

8    committee note to 2000 amendments ("When facts are in dispute, experts sometimes reach

9    different conclusions based on competing versions of the facts.  The emphasis in the

10   amendment on 'sufficient facts or data' is not intended to authorize the trial court to exclude

11   an expert's testimony on the ground that the court believes one version of the facts and not

12   the other.").  Thus, Hillstone's primary argument for excluding Durnal's standard-of-care

13   opinion fails.

14       But the Court's gatekeeping function does not end there.  The Court has an

15   independent duty to determine the admissibility of Durnal's opinions.  *Kirstein v. Parks*

16   *Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) ("We have not required that the *Daubert*

17   inquiry take any specific form and have, in fact, upheld a judge's *sua sponte* consideration

18   of the admissibility of expert testimony.").  *See also United States v. Alatorre*, 222 F.3d

19   1098, 1103 (9th Cir. 2000) (citing the above passage of *Kirstein* with approval); *United*

20   *States v. Babichenko*, 2021 WL 780902, *2 (D. Idaho 2021) ("[T]he Court has an

21   independent gatekeeping function under Federal Rule of Evidence 702 and *Daubert*.").

22       The overarching problem here is that Durnal's opinions are not based on his

23   experience in the law enforcement and liquor control fields.  Instead, his approach largely

24   consists of assuming, as a factual predicate, that Nyerges was obviously intoxicated and

25   then offering a series of obvious conclusions—often purely legal conclusions—that

26   naturally flow from that predicate.  For example, in the portion of his report entitled

27   "Serving Standards," Durnal begins by quoting, in full, the text of A.R.S. § 4-311, which

28   provides in relevant part that a licensee may incur liability by selling "spiritous liquor . . .

- 12 -

to a purchaser who was obviously intoxicated," and then opining that "[a]ccordingly, a licensee such as Bandera is prohibited by law from serving an obviously intoxicated person." (Doc. 92-1 at 7.)  Durnal next quotes, in full, the text of A.R.S. § 4-244, which provides in relevant part that a licensee "may allow an obviously intoxicated person to remain on the premises for not more than thirty minutes after the state of obvious intoxication is known or should be known . . . to transport the obviously intoxicated person from the premises," and then opines that, "[a]ccordingly, a licensee such as Bandera is prohibited by law from . . . allowing an obviously intoxicated person to remain on the premises for more than thirty minutes after the state of obvious intoxication is known or should be known." (*Id.* at 7-8.)  These are not opinions about the standards of care in the restaurant industry that only Durnal, by virtue of his decades of experience in the relevant field, is qualified to give.  Instead, Durnal is essentially reading a statute and then opining that "it is illegal to violate the statute."  Any juror with the ability to read and comprehend the English language could reach the same conclusion by reading the statute (or, as relevant here, by reading a jury instruction based on the statute).  It would not assist the jury, and would create a significant risk of confusion and prejudice to Hillstone, to allow Plaintiffs to pass off such commonsense legal propositions as the opinions of their expert.  *See, e.g.*, *Perez v. County of Los Angeles*, 2012 WL 13005839, *3 (C.D. Cal. 2012) ("[T]hese policies are straightforward and lend themselves to ready comprehension by lay people.  Mr. Jurado's expertise is unlikely to aid a jury's understanding, and because his views would have the imprimatur of an expert, admitting them would raise the risk of unfair prejudice."); *Century Indem. Co. v. The Marine Grp., LLC*, 2015 WL 5566351, *2-4 (D. Or. 2015) (precluding expert testimony where 17-page report consisted largely of citations to legal authority and legal conclusions).  *See generally Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law.  Experts interpret and analyze factual evidence.  They do not testify about the law . . . .") (citation and internal quotation marks omitted); Fed. R. Evid. 704, advisory note to 1972 proposed rules ("[Rules 403, 701, and 702] afford ample assurances against the admission

of opinions which would merely tell the jury what result to reach . . . . They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.").

Durnal also offers a number of opinions concerning Bandera's "Alcohol Awareness Program," but those opinions are again a mixture of improper legal conclusions and commonsense observations that flow naturally and inexorably from the assumption that Nyerges was obviously intoxicated. For example, Durnal opines that because Bandera's policy prohibits "serv[ing] alcohol to an intoxicated person," it follows that "Bandera's employees violated the law and its own policies by serving alcohol to Mr. Nyerges, who was obviously intoxicated at the time he was served." (Doc. 92-1 at 8.) In a similar vein, Durnal opines that, because Bandera's policy prohibits "traditional shots or shooters," it follows that "Bandera employees violated their own policies by serving a shot to Mr. Nyerges." (*Id.* at 8-9.) As with the discussion of A.R.S. §§ 4-311 and 4-244, these opinions are not informed in any way by Durnal's experience and expertise. He is simply reading Hillstone's policy, which expressly prohibits certain conduct, and opining that Hillstone violated its policy by engaging in the prohibited conduct. This is not the stuff of expert testimony.[3]

To be clear, Durnal's opinions are not "per se improper" simply because they concern the ultimate issue of Hillstone's breach of the standard of care. *Hangarter*, 373 F.3d at 1016. Rule 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." "That said, an expert witness cannot give an opinion as to

---

[3]     Durnal's remaining standard-of-care opinions follow the same pattern. He goes on to opine that (1) because the Alcohol Awareness Program requires employees to watch for signs of intoxication, it follows that "Bandera violated the law and its own policies by serving Mr. Nyerges when he was obviously intoxicated" (Doc. 92-1 at 9); (2) because "Arizona law"—which, in context, is a reference to A.R.S. § 4-244—"states that a licensee may allow an obviously intoxicated person to remain on the premises for not more than thirty minutes after the state of obvious intoxication is known or should be known," it follows that "Bandera's employees' actions that night were in violation of Arizona law" because "Bandera employees allowed Mr. Nyerges to stay on the premises for more than thirty minutes and did not arrange a ride home for him" (*id.*); and (3) "Bandera fell below the standard of care in serving Mr. Nyerges when he was obviously intoxicated and by allowing him to stay at the restaurant for more than 30 minutes after they recognized that he was obviously intoxicated" (*id.*). None of these opinions are based on Durnal's experience and expertise.

her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Hangarter*, 373 F.3d at 1016 (internal quotation marks omitted). "Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Id.* "The rule is easy to state but difficult to apply and the outcome depends upon how the expert expresses his opinion." *Fid. Nat'l Fin., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg*, 2014 WL 1286392, *8 (S.D. Cal. 2014). As noted above, Durnal's testimony repeatedly runs afoul of these principles.

Finally, it is true that an expert in Durnal's position is entitled to "rel[y] in part on his understanding of the requirements of state law." *Hangarter*, 373 F.3d at 1017. But as noted, Durnal's opinion is couched *entirely* in terms of Arizona law. It is unclear what Durnal could offer the trier of fact other than his own view of how Arizona law applies to Plaintiffs' contested version of the facts. *Cf. Hillery v. Sun City Anthem Cmty. Assoc., Inc.*, 2019 WL 5095780, *3 (D. Nev. 2019) ("Unlike the example in *Hangarter*, in which an expert stated that defendants' conduct deviated from industry norms relying, in part, on state law to reach his conclusion, here, Mr. Stephens states the legal conclusion—that the area at issue in this case is definitively a place of public accommodation."); *Stewart Title Ins. Co. v. Credit Suisse*, 2015 WL 4250704, *5 (D. Idaho 2015) ("Rush is not using Idaho law to explain industry standards, as was the case in *Hangarter* . . . . Instead, Rush is testifying that Idaho law imposes certain duties on Stewart and that Stewart violated those duties."). Further, unlike some cases, where only portions of the expert's opinions consist of inadmissible legal conclusions, here there is no aspect of Durnal's analysis that isn't ultimately summed up by legal conclusions. *Compare Stewart Title Ins. Co.*, 2015 WL 4250704 at *6 ("Rush is on solid ground, however, when he explains industry standards . . . . For example, Rush opines that Stewart Title's conduct in withdrawing its defense even though nothing had changed from its earlier acceptance was a 'substantial departure from normal title insurance claims handling procedures and practices' . . . .").

The Court recognizes that Arizona courts have permitted standard of care expert testimony in determining dram-shop liability. But Durnal's testimony does not provide

relevant testimony in the way that Arizona courts have found instructive.  In *Dupray*, for example, the Arizona Court of Appeals discussed how a standard of care expert testified that "club personnel did not monitor [the patron's] drinking to determine if he was or had become intoxicated, nor did they prevent him from causing injuries to himself or others." 432 P.3d at 942.  This testimony, the Court held, "provided a legally sufficient basis for the jury to find that JAI breached its duty of care."  *Id.*  Here, by contrast, Durnal does not provide an opinion on any actions Hillstone might have taken to meet its standard of care apart from those expressly derived from Arizona law or from Hillstone's written policy. In other words, Durnal has not provided any fact-based analysis that would assist the jury.

This flaw is particularly notable with respect to Durnal's opinions concerning A.R.S. § 4-244, which provides that, to avoid misdemeanor criminal liability for serving an intoxicated guest, a tavern "may allow an obviously intoxicated person to remain on the premises for not more than thirty minutes after the state of obvious intoxication is known or should be known to the [tavern owner] for a nonintoxicated person to transport the obviously intoxicated person from the premises."  After quoting this statute, Durnal opines that Hillstone violated Arizona law because it did not require Nyerges to leave the premises within 30 minutes while arranging for safe transport.  (Doc. 92-1 at 9.)  The Court could see how, properly presented, testimony about the nature of a tavern's duty to remove an obviously intoxicated patron from the premises and/or arrange safe transportation within a certain time limit could constitute admissible standard-of-care expert opinion.   But Durnal's testimony on this issue does not reference any guidepost other than the statute itself.  The proper interpretation of this statute, and how the jury is to be instructed on its application to the facts, "is the distinct and exclusive province of the court."  *Hangarter*, 373 F.3d at 1016.[4]  *See also Wine Educ. Council v. Ariz. Rangers*, 2021 WL 1573783, *3

---

[4]     As noted in the accompanying summary judgment order, Arizona courts have (with some exceptions) considered § 4-244, a criminal statute, relevant to determining whether a tavern violated its common-law duty regarding obviously intoxicated or minor patrons. *Ontiveros v. Borak*, 667 P.2d 200, 209 (Ariz. 1983) ("Even if the existence of a tavern owner's duty to act with care when furnishing liquor to patrons could not be found by application of common law principle and authority, its existence could be postulated upon the affirmative requirements of [§ 4-244(14)].");  *Patterson v. Thunder Pass, Inc.*, 153 P.3d 1064, 1068 (Ariz. Ct. App. 2007) (concluding that tavern owner satisfied duty of care by

(D. Ariz. 2021) ("Ms. Carter's report does not even pretend to rely on anything other than the application of law to fact. . . . [T]he substantive report itself is nothing more than two paragraphs of legal conclusions . . . .").

Durnal's causation opinions are also inadmissible.  Those opinions consist of two sentences: (1) "Had Bandera followed the standard of care Mr. Nyerges would not have been in the restaurant at the time that he choked, and he never would have choked"; and (2) "Judgment is impaired and bad decisions often follow [when someone drinks to a .08 BAC level], collisions occur, people fall and at times choke on food, which was the case here."  (Doc. 92-1 at 9)

The Court concludes, for reasons similar to those outlined in reference to the standard-of-care opinion, that the first sentence is inadmissible.  Plaintiffs argue this opinion "logically follows" Durnal's standard-of-care opinion (Doc. 106 at 3), while Hillstone contends such an opinion "does not require 'expertise'" and amounts to "a speculative concept the jury understands" (Doc. 108 at 6).  Hillstone is correct.  Durnal's opinion—*i.e.,* had Nyerges been required to leave Bandera before he began eating, he would not have choked—is straightforward factual reasoning that the jury can understand without an expert.  Expert testimony on such matters is inadmissible.  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, — F. Supp. 3d — , 2020 WL 2553181, *6 (S.D. Cal. 2020) ("Expert testimony is inadmissible if it addresses lay matters which a jury is capable of understanding and deciding without the expert's help.") (internal quotation marks omitted); *In re Apollo Grp. Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 961-62 (D. Ariz. 2007) ("[E]xpert testimony is inadmissible if it concerns factual issues within the knowledge and experience of ordinary lay people, because it would not assist the trier of fact in analyzing the evidence.").[5]  In short, as with his standard-of-care opinions, the first sentence of

---

complying with the transportation provisions of § 4-244(14)).  The question of whether, and how, § 4-244 applies to the facts of this case is one for the court and the jury, not an expert.  Again, it would be different if Durnal referred to § 4-244 as one guidepost, alongside his experience working with tavern owners and others in designing adequate alcohol service policies, but Durnal simply applies the plain language of § 4-244 to the facts as he understands them.

[5]     The Court also notes that to the extent Durnal's causation opinion "logically flows"

Durnal's opinion boils down to a commonsense observation. Admitting this testimony would not help the jury understand the evidence or issues in this case, and might unfairly prejudice Hillstone.

The second sentence, wherein Durnal opines that excess alcohol consumption impairs judgment and leads to bad decisions, and that intoxicated people "at times choke on food," is also inadmissible. First, as Hillstone argues and Plaintiffs effectively concede through silence, Durnal does not have (or even purport to have) specialized knowledge or expertise in the relationship between alcohol consumption and choking on food. Moreover, the generalization that drunk people "at times choke on food, as was the case here" does not appear to be based on any facts or data or to be the product of any cognizable principle or method, much less a reliable one. To admit this opinion the Court must find that it is "properly grounded, well-reasoned, and not speculative." Fed. R. Evid. 702, advisory committee note to 2000 amendments. The Court cannot do so here. It is therefore excluded as unreliable.

Finally, Durnal's general observation that when people consume alcohol "to a .08 BAC level" "[j]udgment is impaired and bad decisions often follow," also fails. Durnal has not demonstrated that he is an expert in the types of decisions people make while intoxicated, tied this observation to his expertise in training retailers on the standard of care, or set out any facts, data, principles, or methods on which this observation is based. Thus, like his opinion about alcohol and choking, this portion of the causation opinion fails to meet the reliability standard of Rule 702.

For these reasons, Durnal is not permitted to testify in this case.[6]

…

from his standard-of-care opinions, this undermines rather than supports admission, because Durnal's standard-of-care opinion is inadmissible. The inadmissibility of the standard-of-care testimony renders the causation testimony entirely lacking in foundation, which weighs further against admission. *Cf. Cameron v. Lowes Home Ctrs. Inc.*, 2019 WL 2617032, *4 (D. Ariz. 2019) ("When the report of an expert witness offers 'no foundation' for one of his conclusions, a court may properly exclude that portion of the opinion under Rule 702, *Daubert*, and *Kumho Tire*.").

[6]      The Court need not reach Hillstone's other arguments for complete or partial exclusion.

IV.   <u>Larry D. Stokes And Michael J. Stokes</u>

Plaintiffs retained Larry D. and Michael J. Stokes (the "Stokeses") to calculate the economic loss that resulted from Nyerges's death.  (Doc. 94-1 at 2-13.)  The Stokeses' precise qualifications are unknown to the Court, but Larry Stokes identifies himself as having a Ph.D. and Michael Stokes identifies himself as having an MBA.  (*Id.* at 9.)  The Stokeses considered Nyerges's yearly earnings from 2013 to 2017, based on his tax returns, compared with Nyerges's worklife expectancy to determine under two alternative scenarios the present value of Nyerges's lost earnings and income.  (*Id.* at 2-9.)  Their methods factor in consumer price index and inflation data from the Department of Labor, population and earnings data from the Census Bureau, interest rate data from the Federal Reserve, and average life expectancy data from academic sources and the National Center for Health Statistics.  (*Id.*)  They also subtract a personal consumption allowance and apply a present value discount rate to arrive at their final estimates.  (*Id.* at 6-9.)

A.   **Parties' Arguments**

The entire basis for Hillstone's exclusion motion is that the estate of Lewis Nyerges, represented by Warren Nyerges (the "Estate"), is not a proper party to this action, and that the other plaintiff, Helen Nyerges, who is named as the statutory wrongful death beneficiary, is not entitled to recover the value of Nyerges's lost earnings.  (Doc. 94 at 3-6.)  Hillstone argues that the wrongful death statute provides that only Helen Nyerges, as the surviving parent, is the appropriate plaintiff in a wrongful death action, whereas the Estate could only be the proper plaintiff if there were no other surviving plaintiff.  (*Id.* at 3.)  Citing Arizona case law, Hillstone asserts that a wrongful death plaintiff may recover for injuries such as the lost companionship of the decedent, but not losses to the decedent's estate.  (Doc. 94 at 4.)  Hillstone accordingly argues that because only Helen Nyerges is a proper plaintiff in this action, any testimony about Nyerges's lost earnings is irrelevant and should be excluded.  (*Id.* at 5.)

Plaintiffs respond that although Helen Nyerges brings her claims as a surviving parent under the wrongful death statutes, the Estate (via Warren Nyerges) brings a separate

1   claim pursuant to A.R.S. § 14-3110, which allows for an Estate to bring an action after the

2   decedent's death.  (Doc. 105.)   Plaintiffs argue that it is permissible to assert both a

3   wrongful death claim and a survival claim in the same action and contend that Hillstone

4   was put on notice of the survival claim because (1) the amended complaint states that the

5   Estate brings a claim and (2) one of Plaintiffs' MIDP disclosures specifies that the claim is

6   brought pursuant to § 14-3110.  (*Id.* at 2-4.)

7          In reply, Hillstone argues that Plaintiffs failed to plead a survival claim because the

8   complaint "is entirely devoid of *any* reference to A.R.S. § 14-3110."  (Doc. 110 at 2.)  For

9   this reason, Hillstone argues, there is no survival claim here and consequently the Stokeses'

10  testimony is irrelevant.  (*Id.* at 2-4.)

11         B.     **Analysis**

12         As explained in the accompanying summary judgment order, the complaint

13  adequately asserts a survival claim on behalf of the Estate.  And because Hillstone does

14  not dispute the relevance of the Stokeses' testimony as to that claim, Hillstone's exclusion

15  arguments fail.   Hillstone does not question the reliability of this testimony or the

16  sufficiency of the Stokeses' expertise and the Court finds no independent reason to exclude

17  their opinions.  The Stokeses appear to have relevant expertise, to rely on credible sources

18  and sufficient facts and data, and their testimony appears to be the product of reliable

19  methods that are reliably applied to the facts of the case.

20         …

21         …

22         …

23         …

24         …

25         …

26         …

27         …

28         …

Accordingly,

**IT IS ORDERED** that:

1. Hillstone's motion to exclude the testimony of Chester Flaxmayer (Doc. 93) is **granted in part and denied in part**.

2. Hillstone's motion to exclude the testimony of M. Randy Durnal (Doc. 92) is **granted**.

3. Hillstone's motion to exclude the testimony of Larry D. Stokes and Michael J. Stokes (Doc. 94) is **denied**.

Dated this 2nd day of August, 2021.

_____
Dominic W. Lanza
United States District Judge